## STATE v. DONALD ROBERT CALDWELL.

227 N. W. 2d 382.

March 14, 1975—No. 44651.

*C. Paul Jones,* State Public Defender, and *David Essling,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *William B. Randall,* County Attorney, and *Steven C. DeCoster,* Assistant County Attorney, for respondent.

Heard before Otis, Rogosheske, and Scott, JJ., and considered and decided by the court en banc.

Scott, Justice.

This is an appeal from a conviction of aggravated robbery following a trial by jury in the Ramsey County District Court and from the denial of a motion for a new trial. Defendant was sentenced to an indeterminate term not to exceed 20 years. Upon cross-examination of the prosecution's principal witness, the court sustained objections by the prosecution to questions as to the residence and place of employment of the witness. It is this ruling that the defendant asserts is reversible error. We affirm.

The sole issue presented upon this appeal is: Did the refusal of the trial court to allow defense counsel to cross-examine the prosecution's principal witness as to his residence and place of employment constitute a denial of the constitutional right to confront the witnesses against him and therefore require a reversal of the conviction?

The defendant, Donald R. Caldwell, was tried under an indictment by the grand jury for Ramsey County dated February 6, 1973, on a charge of aggravated robbery. James C. Klabunde, the prosecution's principal witness, testified before the grand jury at that time. His name was endorsed on the indictment. The defendant and two accomplices, Richard Stanley Gakin and Corrine M. Darveaux (also under indictment), received separate trials during which all were convicted and sentenced to indeterminate terms not to exceed 20 years.

The victim of the robbery was Robert S. Thornton. On Novem-

ber 16, 1972, Thornton and his wife had three martinis after work. After taking his wife home, he went to a grocery store where he purchased cigarettes, bacon, and milk. He then drove directly to McGuire's Restaurant and Bar, located in the northern part of Ramsey County, arriving at approximately 8 p.m. He drank alone until about 11 p.m., at which time he met a woman who identified herself as "Sandy," later identified as Corrine Darveaux. At about 1 a.m. Thornton and Darveaux left the bar together. Thornton drove Darveaux to her place of residence, which was in an apartment complex near Silver Lake Road and County Road E in Ramsey County. Thornton and Darveaux got out of the car and started walking toward the apartment. After walking a short distance, "a fellow jumped out" and "rapped" Thornton on the nose. Thornton, an ex-boxer, "rapped him back." Thornton was then hit on the back of the head by another assailant, and was knocked out. When Thornton regained consciousness, a man was sitting upon his back going through his pockets. The man removed $10 in currency and Thornton's watch from his person, and the cigarettes and bacon from his car. Darveaux had disappeared. Thornton got up and drove to the St. Anthony police station to report the incident, arriving at about 1:30 a.m. He then returned to the scene of the robbery with police officers from New Brighton before being taken to Unity Hospital, where his nose was bandaged and he received four stitches on the top of his head. He was released from the hospital at 4:30 a.m. on November 17, 1972.

On November 18, 1972, James C. Klabunde went to the University of Minnesota police department with information concerning a robbery, but was referred first to the Ramsey County authorities. Upon further referral by the latter, Klabunde went to the St. Anthony police station and talked with the officers from the New Brighton police department four or five times during the next two or three weeks. Klabunde described the following events: On November 16, 1972, he had gone to Apartment 102 at 2130 County Road E, an apartment in the area where

Thornton was robbed, to visit his girl friend Jeanette (Bobby) Bentley. He brought some steaks with him and arrived about 6:15 p. m. The apartment was actually rented by one Dorothy Arneson, who lived there with three of her children; Bentley was staying there temporarily. Klabunde dined with Bentley and the Arnesons, and at 8:30 p. m. left the apartment with Bentley and one of Dorothy Arneson's children and drove to the Country Club Market. On their return to the apartment, Klabunde's car collided with another vehicle and Bentley sustained some minor cuts on her right leg. Dorothy Arneson came to the scene and took her daughter, Klabunde, and Bentley back to the apartment, where the witness remained until 7 o'clock the next morning. During the course of the evening, many people entered and left the Arneson apartment. Corrine Darveaux, who lived in another unit in the same building, visited the apartment. At one point, she went into another room in the apartment and conversed with Bentley, Dorothy Arneson, and two men then unknown to Klabunde. Klabunde later identified these men as Richard Gakin and defendant. About 11 p. m., Darveaux, Bentley, Dorothy Arneson, and defendant left the apartment to go to a bar, leaving Klabunde at the apartment. Forty-five minutes later, defendant returned alone and asked Klabunde if Richard Gakin had come over. Upon Klabunde's negative reply, defendant left again, and returned shortly before 1 a. m. with Gakin. Following a phone call at about 1:05, answered by defendant, he left with Gakin. About 1:30 a. m., Darveaux, Gakin, and defendant ran into the apartment, out of breath. Defendant had a "sap" in his pocket, and was carrying a carton of cigarettes and a pound of bacon. Klabunde overheard defendant say that he "had not managed to find any money" on the victim, but "managed to get" a watch off him. Gakin and defendant left the apartment about 2:15 a. m. Defendant returned to the apartment about 3:30 a. m., spoke briefly with Darveaux, and left again. Bentley and Dorothy Arneson returned to the apartment about 5 a. m. Klabunde left about 7 a. m., and walked to the University of Minnesota, where

he worked as a cook. He worked all day, completed some errands, and then went to the University of Minnesota police department about 8 p. m., and offered to provide information about the robbery.

When Klabunde initially talked to the police about the events of November 16 and 17, he claimed he did not know Gakin, Darveaux, or defendant. He did know their first names, and he knew that defendant owned a "beer joint up north." The police told Klabunde to return to the Arneson apartment to learn the last names of the participants. Klabunde did so successfully one week later. He later identified defendant from a photograph which the police had obtained from defendant's place of employment.

The only witness who identified defendant or associated him with the robbery was Klabunde. On direct and cross-examination, Klabunde testified to the version of events which has been set forth above. He also claimed that one week prior to the trial, defendant had confronted him on the University of Minnesota campus. On this occasion, defendant stared directly at Klabunde. Klabunde felt "scared."

The first question asked of Klabunde on cross-examination was, "Where do you live, Mr. Klabunde?" An objection on the ground of relevancy was sustained. Klabunde was then asked about his occupation. He said he was a cook at a fraternity at the University of Minnesota. Defense counsel asked, "What fraternity is that?" A second objection on the grounds of relevancy was sustained. Later, during the same cross-examination, defense counsel asked Klabunde, "Where is your home?" An objection on the grounds of relevancy was sustained.

There is evidence that the witness was moving around from place to place and when asked why the court would not allow the witness' present address and place of occupation to be revealed, the court replied, "I am only doing that to protect him. He's scared."

The defendant denied the confrontation with the witness at

the University of Minnesota, but defendant's counsel admitted disclosing to his client that Klabunde was a cook at the University and suggesting that defendant find out something about him.

Although the record does not disclose any address for Klabunde, the prosecution did turn over five reports made by Klabunde to the police, one of which did exhibit a former address. The state further asserts that at the Rasmussen hearing the prosecutor offered to make his entire file available to defendant's counsel. The court examined it and determined that there was no evidence which would be favorable to the case of defendant. It is also the state's contention that the precise address at the time of trial and the specific fraternity where the witness worked would really add nothing of value for cross-examination purposes. The record does disclose otherwise extensive and thorough cross-examination.

The landmark case in the area of confrontation, and more specifically in the area of the right to cross-examine witnesses as to employment and residence, is Alford v. United States, 282 U. S. 687, 51 S. Ct. 218, 75 L. ed. 624 (1931). A Federal conviction was unanimously reversed because the trial judge had sustained objections to questions by the defense counsel seeking to determine the "place of residence" of a prosecution witness. The defense counsel contended that the jury was entitled to know the identity, residence, and employment of the witness. The court stated:

"* * * It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. * * * To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to dis-

credit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial. * * *

"* * * The question 'Where do you live?' was not only an appropriate preliminary to the cross-examination of the witness, but on its face, without any such declaration of purpose as was made by counsel here, was an essential step in identifying the witness with his environment, to which cross-examination may always be directed. * * *

*　*　*　*　*

"The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted. * * * But no obligation is imposed on the court, such as that suggested below, to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self incrimination, properly invoked. There is a duty to protect him from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him. * * * But no such case is presented here." 282 U. S. 692, 51 S. Ct. 219, 75 L. ed. 628.

In the more recent case of Smith v. Illinois, 390 U. S. 129, 88 S. Ct. 748, 19 L. ed. 2d 956 (1968), the court readily and conclusively applied the Alford rationale. However, as pointed out in respondent's brief, there is a definitely qualifying circumstance which limits the application of the decision. The facts are relatively uncomplicated. An informer made a purchase of heroin from the defendant, and at the trial he was the sole witness to this transaction. The lower court did not require him to reveal his true name or residence when questioned by defense counsel. The Supreme Court reversed, determining that the witness' credibility and the amount of weight to be placed upon his testimony were jury questions. According to a footnote to the majority opinion, both defense counsel and the defendant knew the informer (the attorney had previously represented him), but

the record did not specifically disclose whether or not the informer was known by his true name and address. Thus, Smith is factually unlike the instant case, and no specific facts have been presented here to establish a compelling need for cross-examination in this area.

Noticeable in the Smith decision is the concurring opinion of Mr. Justice White, joined by Mr. Justice Marshall. The concurring opinion foretold the expansion of the doctrine that was to follow by suggesting that the potential danger to the personal safety of the witness should be included in considering the proper boundaries of cross-examination. Yet Mr. Justice White felt that in the absence of a showing by the state of sufficient justification for the refusal to answer the questions, inquiry into true identity and residence is proper.

In United States v. Dickens, 417 F. 2d 958 (8 Cir. 1969), the court concluded that where the Sixth Amendment right of cross-examination had been abridged, prejudice need not be shown to justify reversal. The court focused upon the "crucial factors" that could have been shown in cross-examination, among which was whether the government's principal witness, an accomplice of the defendant, had been granted immunity, as evidence of the state of mind and expectations of the witness. Included in the determination was reasoning with regard to questioning about place of residence, but merely as dicta, with at least an intimation that this denial, alone, would not necessitate reversal of a conviction.

It therefore appears that when any such cross-examination is limited, the court may be treading on an accused's constitutional right to be "confronted with the witnesses against him" under the Sixth Amendment of the United States Constitution as applied to the states through the due process clause of the Fourteenth Amendment.

The element of danger or fear has become increasingly acceptable as a justification for the refusal to require the witness to respond to questions regarding his present address. See, con-

curring opinion of Mr. Justice White in Smith v. Illinois, 390 U. S. 129, 133, 88 S. Ct. 748, 751, 19 L. ed. 2d 956, 960. In United States v. Smaldone, 484 F. 2d 311 (10 Cir. 1973), certiorari denied, 415 U. S. 915, 94 S. Ct. 1411, 39 L. ed. 2d 469 (1974), the court held that a denial of the right to cross-examine as to present address caused no constitutional deprivation. There was no lack of knowledge on the part of the defendant as to the background of the witness, and the trial court had been informed by the prosecution that the witness had been relocated because there existed "an apparent danger to the physical health and well-being" of the witness. In light of this, as well as evidence on a motion for change of venue, the court concluded that the action of the trial court was proper. Further, it stated that defense counsel had reason to know that the prosecution would object to that line of questioning, yet he failed to make any affirmative showing as to why it would have been proper to establish these facts. The court viewed "the effort of defense counsel as primarily tactical rather than as a desire to obtain the address." 484 F. 2d 319.

The evidence of fear or danger in the case before us is sufficient to justify the trial court's ruling. The record indicates that there was, otherwise, a full, complete, and effective cross-examination, and that the court had the benefit of observing the witness, his demeanor, and his fear. Therefore, despite the fact that the evidence of actual danger was less than conclusive, that evidence, coupled with the otherwise effective cross-examination, indicates that the refusal by the trial court was proper. The defendant was apprised of information that would place the witness in his community and that would aid in further investigation if desirable. Although it is recommended that the courts continue the present policy of strictly limiting any restriction upon cross-examination, under the totality of the circumstances evidenced here, any error was harmless and the conviction is affirmed.

Affirmed.