**STATE of Minnesota, Respondent,**

v.

**Joseph Stroebe COX, Appellant.**

**Nos. 48785 and 49167.**

Supreme Court of Minnesota.

March 23, 1979.

Rehearing Denied May 1, 1979.

---

Thomson & Nordby and Jack S. Nordby, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, John O. Sonsteng, County Atty., and Carol A. Collins, Asst. County Atty., Hastings, for respondent.

Heard before ROGOSHESKE, KELLY, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This matter involves an appeal by defendant James Stroebe Cox from a judgment of conviction by the Dakota County District Court, sitting without a jury, for the attempted first-degree murder of defendant's wife. We affirm.

Defendant and his wife were married on March 21, 1974, and had many marital difficulties. These problems arose, in substantial part, as a result of Mrs. Cox's jealousy of defendant's prior marriage and a child of that previous marriage. Their jobs (both were employed by Braniff Airways) caused them to be separated about 15 days each month. Mrs. Cox testified that they engaged in arguments and that on occasion defendant would get "physical" by holding her down, yelling, and slapping her. They received counseling and conferred with a priest about their marital problems, but in October 1976 Mrs. Cox consulted an attorney regarding a divorce. On November 19, 1976, divorce papers were served on defendant.

Mrs. Cox planned to take the couple's child to Colorado for a visit on November 29, 1976. She testified that on November 28, 1976, the night before she was to leave for Colorado, defendant suggested that she park her car in the garage so it would be warm for the baby (who had a cold) in the morning. Accordingly, the car was parked in the garage. She stated that she normally left her car in the driveway.

Mrs. Cox, who was not sharing a bedroom with defendant at the time, awoke the next morning at 4 a. m. and saw defendant walking about the house fully dressed. She also smelled a strange odor in the house and mentioned it to defendant, who first stated that he did not smell it but later said that he did notice the odor and that maybe it was the refrigerator. Defendant checked the refrigerator and stated that it was not the source of the odor. He then drove his wife and baby to the airport in Mrs. Cox's car.

Mrs. Cox and the baby returned from Colorado in the early afternoon of December 4, 1976. Later that day she picked defendant up at the airport in her car. On the way home defendant asked his wife if she was still going through with the divorce. She responded that she did intend to go through with it. Upon arrival at their home, a few minutes after 10 p. m., Mrs. Cox parked her car in the driveway, but defendant told her to leave the car in the garage. She responded that one of the family pets would get out if the garage door were opened. Defendant denied that the pet would run out, and Mrs. Cox then parked her car in the garage. At that time defendant's van was parked in the driveway.

Shortly after arriving home, Mrs. Cox went to bed. A few moments later, about 10:30 p. m., defendant came to the doorway

of her bedroom and asked her why she was going through with the divorce. She responded that she was tired and wanted to go to sleep. Defendant then left the room, but returned a few minutes later to take the dog that usually slept in Mrs. Cox's room outside. Mrs. Cox told defendant she had already taken the dog out and it was not necessary to do so again. At that time, Mrs. Cox also smelled the same odor she had noticed in the house a week before. Defendant again suggested that the smell might be coming from the refrigerator and said that he would check on it. The dog was removed from the bedroom and placed in the kennel located in back of the house.

Later, as Mrs. Cox was falling asleep, she felt a heavy weight on her shoulder and knew her husband was on top of her. She again smelled the same odor, and it was very strong. She felt a cold rag on her face, couldn't breathe, and struggled with defendant. They fell to the floor and she was able to bite defendant, but he managed to hold her down and put the rag to her face until she lost consciousness.

When Mrs. Cox came to her senses she was sitting in her car in the garage, the motor was running, and her hands and feet were bound with tape. Although very weak, she attempted to get out of the garage by putting the car in reverse, but instead put it in drive. The vehicle moved forward and struck some skis and tray tables. According to Mrs. Cox's testimony, defendant then came out of the house, turned off the motor, and removed the tape from her hands. Mrs. Cox begged defendant not to kill her and told him she wouldn't get the divorce. They both went back into the house and talked for awhile. Mrs. Cox was still having difficulty breathing and stated that she wanted to be near defendant "so I knew he was right there."

The couple then went for a short walk. During the walk defendant turned off the motor of his van, which had been running. He told his wife that he left the van running so that neighbors would not notice the car running in the garage. After they returned to the house, Mrs. Cox asked defend-ant why he tried to kill her. According to her testimony, defendant responded that he tried to kill her because he didn't want her to have a relationship with anyone else, and if he couldn't have her no one could.

Defendant and his wife stayed up all night, playing cards and watching television. Mrs. Cox stated that she remained with defendant through the night because she didn't want to leave him in the house with the baby. In the morning they went to Perkins Pancake House for breakfast, and in the restroom there she prepared a note to Father Burns, her priest, asking him to come to her house because her husband had tried to kill her. The Coxes returned home and later went to the 11 a. m. mass at their church, where Mrs. Cox slipped the note to a woman and asked her to deliver it to Father Burns.

Shortly after defendant and his wife returned home, Father Burns and Dale Brule, a police officer, arrived. Mrs. Cox testified as follows regarding the next events:

"He [defendant] came over and stood in front of the couch while they [Father Burns and Officer Brule] were standing there. And I looked at him and said, 'I'm sorry, Joe, I had to call Father Burns.' And Father Burns said something to the effect, 'Joe, I heard you had an argument here or a misunderstanding.'

"Well, I don't know if he answered, 'Yes,' or not. He introduced Dale Brule, or Dale Brule introduced himself, and I said, 'Joe, you are going to deny everything, but you tried to kill me last night. You put a wet rag on my face and then I woke up in the car. What was it, paint thinner or what was it.' I think at this time, this is when he said, 'Starting Fluid.' And Father Burns said, 'Joe, did you do this?' and he said, 'Yes, I did.' Dale Brule cut in and read him his rights and said, he had the right to an attorney.

"Then Father Burns or Dale Brule, I can't recall, one of them; I did hear someone asking, 'Did you do this,' and he did say, 'Yes, I tried to kill her,' and Dale Brule again started talking."

Father Burns corroborated that defendant admitted to his wife, "I did try to kill you. I'm sorry that I did." Similarly, Officer Brule testified that defendant said to his wife, "Yes, I did it. I tried to kill you." In addition, Officer Brule stated that Mrs. Cox asked defendant if he had tried to kill her the week before and he replied, "Yes, I'm sorry, it was starting fluid."

Defendant testified in his own behalf, stating that on the night in question he used the starting fluid to start his van and then decided to use the fluid to "scare" his wife. He said that when he put the rag with the fluid to her face he did not intend for her to lose consciousness, but when she did he decided to place her in the car to frighten her even more. He taped her hands and feet and started the car. A short time later he returned to the garage and freed his wife. According to defendant's testimony, he did not see or hear the car move in the garage and the car was in the same position when he returned to the garage as it had been before. He admitted telling his wife that he tried to kill her, but testified that he said that to "scare" her. Defendant stated that he started the van to warm it up and left it running by mistake, but conceded that he told his wife that he left the van running to cover the noise of the car in the garage. Defendant was asked on cross-examination if he admitted to Father Burns and Officer Brule that he tried to kill his wife. At first he gave no response, then stated, "I don't remember exactly what I said to Father Burns or Officer Brule. I was trying to scare her."

The following issues are presented in this case:[1]

(1) Was the evidence sufficient to prove beyond a reasonable doubt that defendant intentionally and with premeditation attempted to kill his wife?

(2) Did the evidence show that defendant did not voluntarily and in good faith abandon his attempt?

1. This court, in reviewing the sufficiency of the evidence in criminal cases, will apply the same standard of review to cases heard before a court without a jury as is applied to those heard by a jury. *State v. Mytych*, 292 Minn. 248, 194 N.W.2d 276 (1972). See, also, *State v. Crosby*, 277 Minn. 22, 151 N.W.2d 297 (1967); *State v. Gardin*, 251 Minn. 157, 86 N.W.2d 711 (1957). Accordingly, this court will uphold the district court's finding if, based on the evidence contained in the record, the district court could reasonably have found defendant guilty of the crime charged. Moreover, in making this determination the court must view the evidence in a manner most favorable to the state and assume that the district court disbelieved contradictory testimony. *State v. Hawkins*, 260 N.W.2d 150 (Minn.1977); *State v. Hill*, Minn., 253 N.W.2d 378 (1977).

Murder in the first degree is committed under Minn.St. 609.185(1) when a person "[c]auses the death of a human being with premeditation and with intent to effect the death of such person * * *." Minn.St. 609.18 defines premeditation as "to consider, plan or prepare for, or determine to commit" the crime in question. Premeditation need not exist for any specific length of time. See, e. g., *State v. King*, 286 Minn. 392, 176 N.W.2d 279 (1970); *State v. Ware*, 267 Minn. 191, 126 N.W.2d 429 (1964). Attempted crimes are proscribed by Minn.St. 609.17, subd. 1, which reads, in part, as follows:

"Whoever, with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime is guilty of an attempt to commit that crime * * *."

The record contains sufficient evidence for the district court to reasonably find that defendant intentionally and in a premeditated manner attempted to effect the death of his wife.

1. We note that the state, in its brief, also raises the issue of whether this appeal should be dismissed because the filing of appellant's brief was untimely. Since the state has failed to show that it has been prejudiced by the late filing, we find no merit in the state's claim.

The record shows that defendant applied a rag doused with starting fluid to his wife's face until she lost consciousness and then carried her to her car in the garage, taped her hands and feet together and turned on the car's motor. Defendant admitted to his wife, Father Burns, and Officer Brule that he intended to kill her. The only evidence which contradicts a finding of intent is that offered by defendant at trial: that he was only trying to "scare" his wife, not to kill her. This was the first time defendant claimed that he only intended to scare his wife. When Father Burns and Officer Brule arrived at his home he did not say he only tried to scare Mrs. Cox, but instead admitted he attempted to kill her. Thus, the record contains adequate support for the trial court's finding of intent.

The evidence also shows that the attempted killing was premeditated. There is evidence that on November 29, 1976, a week before the night in question, defendant was planning to kill his wife. Mrs. Cox arose very early that morning, at 4 a. m., to go on a trip. She observed that defendant was up and fully dressed. She also smelled the same odor in the house that she later identified as the odor of starting fluid which defendant applied to a rag and put to her face on December 4, 1976. But more importantly, the record discloses that on the night in question defendant insisted that Mrs. Cox park her car in the garage, although she usually left it in the driveway. He removed the dog from her bedroom even though it usually slept there. Finally, defendant left his van running in the driveway to, as he later told his wife, cover the noise of the car running in the garage. He apparently hoped his wife's death would be viewed as a suicide or accident.

The above facts provide a reasonable basis for the district court's finding that defendant's wrongful act was premeditated. Additionally, defendant's conduct of causing his wife to lose consciousness, placing her in the car, and turning on the vehicle's motor constitutes substantial steps toward the commission of the crime. Therefore, the district court's conviction of defendant for attempted first-degree murder is properly supported by the record.

2. The defendant further contends that if an attempt did take place it was abandoned. Minn.St. 609.17, subd. 3, provides as follows:

"It is a defense to a charge of attempt that the crime was not committed because the accused desisted voluntarily and in good faith and abandoned his intention to commit the crime."

This defense is made a part of the Minnesota Criminal Code because "[i]t is believed * * * to be desirable to encourage the voluntary good faith withdrawal from the commission of the crime." Advisory Committee Note to Minn.St. 609.17, 40 M.S.A., p. 177 (1964). An attempt is not voluntarily abandoned within the scope of § 609.17, subd. 3, if a defendant refrains from carrying out his criminal act because of intervening circumstances, such as being frightened by the arrival of law enforcement personnel. See, *State v. Hansen*, 290 Minn. 552, 188 N.W.2d 881 (1971); Advisory Committee Note to Minn.St. 609.17, 40 M.S.A., p. 175 (1964).

In rejecting defendant's claim of abandonment, the district court reasoned that:

"In the present case, the defendant did remove the tape from his wife's hands and feet, but this was done only after she regained consciousness, put the car in which she was bound in gear, and the car had moved forward, striking some skis and trays. The defendant feared that the noise might attract attention and that his scheme to make his wife's death appear to be an accident or a suicide would not succeed. His actions cannot be characterized as being voluntary or in good faith and so the defense of abandonment is not available to him in this case."

Defendant claims that he had not seen or heard the car move and only returned to the garage when he thought his wife was sufficiently frightened. Mrs. Cox, though, testified as follows:

"Q   What happened when the car went forward?

"A It hit the trays and the skis fell down.

"Q What happened?

"A I noticed it hit to the right side of me, and I knew that my husband had come out of the house into the garage and he came in through the passenger door and turned the car off."

Apparently the trial court relied upon the inference, drawn from the above testimony of Mrs. Cox, that defendant went back into the garage as a result of the noise caused by the car moving forward. This inference provides an adequate basis for the trial court's decision.

Affirmed.