**STATE of Minnesota, Respondent,**

v.

**Christian N. FRANKS, Appellant.**

No. A06–1242.

Supreme Court of Minnesota.

May 14, 2009.

Lawrence Hammerling, Chief State Appellate Public Defender, Bridget Kearns Sabo, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Minnesota Attorney General, St. Paul, MN; and Mark A. Ostrem, Olmsted County Attorney, Kathy W. Wallace, Assistant Olmsted County Attorney, Rochester, MN, for respondent.

## OPINION

GILDEA, Justice.

In this appeal we consider whether the evidence was sufficient to sustain appellant Christian N. Franks' conviction for engaging in a pattern of harassing conduct and whether the district court erred in sentencing. Franks was tried and convicted of four counts of violation of an order for protection, Minn.Stat. § 518B.01, subd. 14(d) (2008), and one count of pattern of harassing conduct, Minn.Stat. § 609.749, subd. 5 (2008). Franks' convictions arise from a series of letters he wrote to his estranged wife, their two children, his in-laws, and his wife's friend. The district court sentenced Franks to 51 months and 3 days in prison, reflecting consecutive sentences for each order for protection

violation, but declined to sentence Franks for the pattern of harassing conduct. The court of appeals affirmed. We granted Franks' petition for further review.

Franks raises three issues on appeal. First, Franks challenges his conviction for engaging in a pattern of harassing conduct, arguing that the evidence presented at trial was insufficient as a matter of law to support the guilty verdict. Second, Franks challenges the district court's decision to sentence him on the four order for protection violations, rather than on the more serious crime of engaging in a pattern of harassing conduct. Third, Franks argues that the district court erred in sentencing him consecutively rather than concurrently, arguing that consecutive sentences violate Minnesota's sentencing guidelines and unduly exaggerate the criminality of his conduct. Because we conclude that the evidence was sufficient, but that the district court erred in sentencing, we affirm in part, reverse in part, and remand for resentencing consistent with this opinion.

The record reflects that Franks met J.R. in 1996. Franks and J.R. had two children together: A.F., born in 1996, and B.F., born in 2001. The couple married in 2002. In January 2003, J.R. and Franks separated; the marriage was dissolved in 2004.

Shortly after the couple's separation, in early February 2003, Franks broke into J.R.'s house. Franks threatened to kill J.R. and himself, and dragged J.R. around the house searching for a shotgun. As a result of this incident, J.R. obtained an order for protection against Franks on February 10, 2003. The order stated that Franks "shall have no contact, either direct or indirect, with [J.R.] or the children, whether in person, with or through other persons, by telephone, letter, or in any other way" except by court-supervised visi-

tation. Franks was present at the order for protection hearing.

Just two days later, on February 12, 2003, Franks used a crowbar to pry open J.R.'s basement window in the early morning hours. Franks entered J.R.'s home, and sexually assaulted her. Franks was prosecuted and convicted of terroristic threats, Minn.Stat. § 609.713, subd. 1 (2008), burglary in the first degree, Minn. Stat. § 609.582, subd. 1(c) (2008), and criminal sexual conduct in the third degree, Minn.Stat. § 609.344, subd. 1(c) (2008). The district court sentenced Franks to 78 months in prison.

In January 2004, J.R. sought and received an extension on her order for protection against Franks through February 10, 2005. Franks received a copy of the second order for protection. The terms of the new order were identical to those contained in the original order for protection.

While serving his prison term for terroristic threats, burglary, and criminal sexual conduct, Franks wrote a series of letters to the children, J.R., J.R.'s parents, and to one of J.R.'s friends. On March 5, 2004, and June 18, 2004, Franks addressed letters to his two young children, A.F., approximately age 8, and B.F., approximately age 3. The letters discussed a wide range of topics, including hockey, swimming, A.F. and B.F.'s relatives, and video games. The March 5 letter also included a request for A.F. and B.F. to visit Franks in prison. Franks wrote: "I wish I could see you guys. You boys are allowed to come see me in prison. You have to ask your mom if you can come see me. She's the only one stopping you from visiting me." In Franks' June 18 letter to A.F. and B.F., Franks renewed his plea for his sons to visit him in prison, writing: "Your mom has to sign a simple consent form without all the stupid stipulations. Ive [sic] lived up to all my obligations now its

[sic] your moms [sic] turn to live up to hers."

On June 27, 2004, and July 7, 2004, Franks sent two letters to J.R.'s friend. Both letters covered a variety of topics, including Franks' life in prison, mutual friends, J.R., and the children. Franks further said: "Im [sic] getting really muscular," "By the time I get out I will be really big," and "Ill [sic] be out soon 3 more years isn't very long." In the June 27 letter, Franks described his past sexual relations with three of J.R.'s friends. Franks also wrote: "I dont [sic] care if you tell [J.R.] about her friends . . . ." Franks' July 7 letter to J.R.'s friend described Franks' and J.R.'s past sexual relations in detail. Franks also asked J.R.'s friend if she knew why J.R. "still hasn't signed the visitation papers so my children can come and see me." In that letter, he also said, "When I get out Im [sic] gonna work a sh—ty paying job so [J.R.] cant [sic] get a ton of money from me," "she'll only get around 500 to 600 a month from me if she is lucky," "within[ ] a few years of my release Ill [sic] have custody of at least one of my boys," "[my] attorney is taking [J.R.] back to Court if she doesnt [sic] sign the [visitation] papers real soon," and "[J.R.] will be held in contempt of court."

Franks wrote two letters directly to J.R. around July 22, 2004, and August 2, 2004. Both letters discussed Franks' desire for A.F. and B.F. to visit him in prison. Franks wrote around July 22: "The judge ordered that you sign a permission slip for the boys to come and see me." And continued: "Do the right thing and sign the visitation papers as you were instructed to do . . . ." Franks also said "Dont [sic] you think you've been playing a game with me plenty long?" "If you choose to let me sign my [parental] rights away. You will not be getting any type of child support from me. I know how important money is to you." Franks' August 2 letter similarly pleaded with J.R. to allow visitation. Franks wrote:

I just want you to know that I am not interested in you anymore and that I dont [sic] want any more contact with you than nessesarry [sic]. But what I do know is that we have two children together so at some point we are going to have to deal with each other in an adult manor [sic] so we can properly raise our children. I am not planning on badgering the children to get information about you. To be honest I don't care the least but [sic] what your [sic] doing. The only thing that I know for shure [sic] is I love those boys more than life itself. And I dont [sic] want anything more in this world than to see those boys on a regular basis. Those boys need to see their father. Regardless of what you think.

Franks added that: "I just talked to both the boys on Sunday and they told me they loved and miss me very much and the[y] wanted to see me bad. I keep telling them it should be soon." [1]

At some point while in prison (the record does not reflect the precise date), Franks also sent a letter to J.R.'s parents. In the letter, Franks apologized to J.R.'s parents for his behavior and asked them to convince J.R. to allow A.F. and B.F. to visit Franks in prison. Franks wrote: "Please try to talk to [J.R.] and make her understand that her grudge against me is hurting the children."

At trial, J.R.'s friend and J.R.'s mother both testified that they shared the letters

---

1. Franks apparently spoke on the telephone with his sons when his sons were visiting one of Franks' relatives.

they received with J.R. Both J.R.'s friend and J.R.'s mother further testified that they believed Franks wrote the letters to them to communicate with J.R. "in a roundabout way."

J.R. testified that she was "disgusted" by the June 27 letter to her friend, and stated generally: "It makes me fearful that he still continues to try and contact me one way or another." At a different point in J.R.'s testimony, the State asked J.R., "when [Franks] contacted you, how did you feel?" J.R. said: "I didn't like it. And I'm very scared of him." In addition, a police officer whom J.R. contacted after receiving the letters testified, without objection, that J.R. told the officer that she (J.R.) felt "afraid" when she received the letters.

The State charged Franks with four counts of violation of an order for protection under Minn.Stat. § 518.01, subd. 14(d), and one count of committing a pattern of harassing conduct in violation of Minn.Stat. § 609.749, subd. 5 (2006). The matter proceeded to trial, and Franks waived his right to a trial by jury. The district court judge found Franks guilty on all charges. In its order, the court found that each of the two letters written to the children (March 4 and June 18) and each of the two letters written to J.R. (July 22 and August 2) supported one violation of the order for protection. The court also found that the letters Franks sent to J.R., her friend, and her parents, together constituted a pattern of harassing conduct, in violation of Minn.Stat. § 609.749, subd. 5.

Following the State's recommendation, the district court sentenced Franks to 51 months and 3 days in prison, to be served consecutively to Franks' existing prison term. The total sentence represented four consecutive sentences—one for each order for protection violation. The court declined to sentence Franks for the pattern of harassing conduct conviction. The court found that Franks' order for protection violations were "plainly person offenses," thereby allowing the court to sentence Franks consecutively. *See* Minn. Sent. Guidelines II.F (2005). The court stated that consecutive sentences were appropriate for Franks

> because of the seriousness of Mr. Franks' prior conduct toward this victim, very serious conduct indeed, and because the new offenses are simply a repetition of contact with her that is unwanted, that's criminal, and, in my view, does make reasonable the State's request that Mr. Franks be incarcerated for as long as is legally possible because of his conduct.

The court of appeals affirmed Franks' conviction and sentence, *State v. Franks*, 742 N.W.2d 7, 16 (Minn.App.2007), holding that the evidence presented at trial was sufficient to convict Franks of engaging in a pattern of harassing conduct, *id.* at 12, and that the district court properly sentenced Franks consecutively for his four violations of an order for protection, *id.* at 12–16. We granted Franks' petition for review.

I.

We turn first to Franks' argument that the evidence is insufficient to support his conviction for engaging in a pattern of harassing conduct. The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the State to prove beyond a reasonable doubt every fact necessary to constitute the crime with which the defendant is charged. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Our standard of review for sufficiency of the evidence claims is well-settled. We have repeatedly recognized that when the claim is that the evidence is not sufficient,

"our review is limited to ascertaining whether under the evidence contained in the record the jury could reasonably find the accused guilty of the offense charged." *State v. Norgaard,* 272 Minn. 48, 52, 136 N.W.2d 628, 631–32 (1965); *State v. Doppler,* 590 N.W.2d 627, 635 (Minn.1999) ("When considering whether the evidence in a case is sufficient to support a guilty verdict, we examine the evidence presented in the record, along with legitimate inferences from that evidence, to determine whether the jury could have concluded that the state met its burden of proving beyond a reasonable doubt that the defendant was guilty of the offense charged.").

Our precedent does not permit us to reweigh the evidence. *State v. Robinson,* 536 N.W.2d 1, 2 (Minn.1995) ("We reject defendant's request ... that we weigh the evidence, as a kind of 13th juror, and grant him relief on the ground the verdict of guilty was against the weight of the evidence."). Rather, our precedent requires that we construe "the evidence in the light most favorable to the verdict." *Id.* These time-honored principles apply whether the trier of fact is a jury or the court. *State v. Cox,* 278 N.W.2d 62, 65 (Minn.1979). Accordingly, consistent with our precedent, we must uphold the conviction "if, based on the evidence contained in the record, the district court" sitting as the finder of fact "could reasonably have found [Franks] guilty." *Id.*

A defendant is guilty of a pattern of harassing conduct when: (1) the defendant commits two or more designated predicated offenses, including violation of an order for protection, (2) the defendant knows or has reason to know that this conduct would cause a particular victim under the circumstances to feel terrorized or to fear bodily harm, and (3) the defendant's conduct causes the victim to feel terrorized or to fear bodily harm. Minn.Stat. § 609.749, subd. 5(a). Franks argues that the evidence was not sufficient to prove either the second or the third element.

## A.

We first consider Franks' argument that the State did not prove that he knew or had reason to know under the circumstances that he would cause J.R. to feel terrorized or to fear bodily harm. Specifically, Franks argues that the phrase feel terrorized in Minn.Stat. § 609.749, subd. 5(a) means "causing extreme fear by use of violence or threats," and that the evidence is not sufficient to prove that he knew his behavior would cause J.R. to feel so terrorized. The State responds that "feel[ing] terrorized" means feeling "threatened," "intimidated," or "afraid."

### 1.

To assess Franks' argument, we must examine what the statute requires. Minnesota Statutes § 609.749, subd. 5(a) states:

A person who engages in a pattern of harassing conduct with respect to a single victim ... which the actor knows or has reason to know would cause the victim under the circumstances to feel terrorized or to fear bodily harm and which does cause this reaction on the part of the victim, is guilty of a felony....

*Id.* The statute defines "a pattern of harassing conduct" as two or more acts within a five-year period that violate or attempt to violate any of a number of enumerated offenses, including Minn.Stat. § 518B.01, subd. 14, which penalizes violating an order for protection. Minn.Stat. § 609.749, subd. 5(b). But the statute does not define "terrorized."

Although we have not yet interpreted the phrase "feel terrorized" contained in Minn.Stat. § 609.749, subd. 5(a), we have interpreted similar language from another

statutory provision. In *State v. Schweppe*, 306 Minn. 395, 400, 237 N.W.2d 609, 614 (1975), we interpreted the term terrorize in the context of Minnesotas terroristic threats statute, Minn.Stat. 609.713, subd. 1 (1988), which penalized persons who threaten[ ] to commit any crime of violence with purpose to terrorize another.[2] We concluded that the word terrorize means "to cause extreme fear by use of violence or threats." *Schweppe*, 306 Minn. at 400, 237 N.W.2d at 614. The legislature has directed that "when a court of last resort has construed the language of a law, the legislature in subsequent laws on the same subject matter intends the same construction to be placed upon such language. . . ." Minn.Stat. § 645.17 (2008). Thus, when the legislature enacted Minn.Stat. § 609.749 in 1993 as part of comprehensive anti-stalking legislation, *see* Act of May 20, 1993, ch. 326, art. 2, § 22, 1993 Minn. Laws 1999, 2010–13, we can presume that the legislature intended the term "terrorize[ ]" in Minn.Stat. § 609.749, subd. 5 to carry the same meaning as the word "terrorize" that we construed in *Schweppe*—to cause extreme fear by use of violence or threats.

In addition, the structure of Minn.Stat. § 609.749 supports Franks' interpretation of the statute. Minnesota Statutes § 609.749, subds. 1–2, which precede section 609.749, subd. 5, punish "harassment" as a gross misdemeanor. The statute defines "harass" as "engag[ing] in intentional conduct which (1) the actor knows or has reason to know would cause the victim under the circumstances to feel frightened, threatened, oppressed, persecuted, or intimidated; and (2) causes this reaction on the part of the victim." Minn.Stat. § 609.749, subd. 1. By contrast, section

609.749, subd. 5, a felony, requires proof of two or more offenses constituting a pattern of harassment (including, notably, violations of Minn.Stat. § 609.749, subd. 2 itself), plus proof that "the actor knows or has reason to know [his actions] would cause the victim under the circumstances to feel terrorized or to fear bodily harm and which does cause this reaction on the part of the victim. . . ." If "terrorize" were defined identically to "harass," as the State appears to suggest, a felony prosecution under Minn.Stat. § 609.749, subd. 5 would often require no additional proof beyond what is required to prove the lesser-included harassment charge, a gross misdemeanor. *See, e.g.,* Minn.Stat. § 609.749, subd. 2(a)(4)-(6). We apply the rule that "[e]very law shall be construed, if possible, to give effect to all its provisions." Minn. Stat. § 645.16 (2008). Given the structure of section 609.749, with subdivision 5 carrying a greater penalty than subdivision 2, we can infer that the legislature intended the phrase "feel terrorized" to mean something more than feeling "frightened, threatened, oppressed, persecuted, or intimidated."

Based on the above analysis, we conclude that the phrase feel terrorized in Minn.Stat. 609.749, subd. 5 means to "feel extreme fear resulting from violence or threats."

2.

■ With this statutory analysis in mind, we consider Franks' argument that the evidence presented at trial was insufficient as a *matter of law* to show the second element of the crime of engaging in a pattern of harassing conduct—that Franks knew or had reason to know he would

**2.** The statute was amended in 1990 to provide: Whoever threatens, *directly or indirectly,* to commit any crime of violence with purpose to terrorize another is guilty of making terroristic threats. Minn.Stat. § 609.713, subd. 1 (2008) (emphasis added). The 1990 amendment adding the words directly or indirectly has not changed courts interpretation of the word terrorize. *See, e.g., Sykes v. State,* 578 N.W.2d 807, 811 (Minn.App.1998).

cause J.R. under the circumstances to feel terrorized or to fear bodily harm. This element requires that we examine Franks' conduct. The conduct at issue is reflected in the statements Franks made in the letters he aimed at J.R. in violation of the order for protection.

■■■ It is important to note at the outset that the State does not have to prove that the conduct amounted to an express threat. *See State v. Murphy,* 545 N.W.2d 909, 916 (Minn.1996) (explaining that the act of leaving part of a dead animal on a victim's property conveyed a threat to injure, kill, or commit some future crime against the victim). The test of whether words or phrases are threatening is the context in which they are used. *Schweppe,* 306 Minn. at 399, 237 N.W.2d at 613. Finally, it is proper to view a defendant's words and acts in the context of the defendant's relationship with the victim, including evidence of past crimes against the victim. *State v. Henriksen,* 522 N.W.2d 928, 929 (Minn.1994) (concluding that a witness's reference to the defendant's pending arson case was not prejudicial because it was part of the witness's explanation of why the phrase "[i]t's time to play ball" was threatening).[3]

The context for this case is one of domestic violence. *See State v. Robinson,* 718 N.W.2d 400, 405 (Minn.2006) (referencing 1989 Task Force on Gender Fairness in the Courts as having "alerted us to the thousands of cases of domestic abuse reported each year and the critical need to assure that domestic abuse victims receive both civil and criminal legal relief."). Indeed, Franks himself admitted during trial

that he wrote the letters in question, that J.R. received the letters, and that he had a history of "terrorizing" J.R., which included: (1) threatening to kill J.R. as he dragged her around the house searching for a shotgun, and (2) responding to a court order prohibiting contact with J.R. and their children by entering J.R.'s home and raping her. Given that J.R. was a victim of domestic violence, *Robinson,* 718 N.W.2d at 405 (discussing "unique legal needs" of victims of domestic violence), and construing the letters in the light most favorable to the verdict, as our standard of review requires, it is clear that a reasonable fact-finder could have found the evidence sufficient to prove that Franks had reason to know J.R. would consider the letters threatening and cause her to feel extreme fear.

A more detailed description of contents of the letters proves this to be the case. On March 5, 2005, and June 18, 2004, Franks sent his young sons letters in which he said J.R. was "the only one stopping [his sons] from visiting [him]," "it hurts you boys not being able to see [me]," "its [sic] not fair that you boys cant [sic] see your cousins or your Aunte," and "when I get out you guys will see [your aunt] and your cousins all the time. So its [sic] pointless what your mothers [sic] doing." Because of the age of the boys, Franks had reason to know that J.R. would need to read the letters to them.

When the letters to his sons failed to make J.R. agree to prison visitation, Franks wrote to one of J.R.'s close friends on June 27, 2004. In this letter, Franks lewdly described his numerous acts of infi-

---

**3.** *See also Boniek v. Boniek,* 443 N.W.2d 196, 198 (Minn.App.1989) (explaining that, in light of the past history of abuse, the defendant's intent to cause his ex-wife to fear bodily injury could be inferred from the acts of leaving a mutilated copy of the parties' marriage li-

cense along with a note saying "if this is what you want this is what you will get," and from his physically aggressive behavior toward an insurance salesperson while in his ex-wife's presence).

delity with J.R.'s friends and indicated that although J.R. was unaware of those acts, Franks did not care if the friend told J.R. about his infidelity. Franks further said "Im [sic] getting really muscular," "By the time I get out I will be really big," and "Ill [sic] be out soon 3 more years isn't very long."

When the initial letter to J.R.'s friend failed to make J.R. agree to prison visitation, Franks wrote another letter to the friend on July 7, 2004. In that letter, he said "When I get out Im [sic] gonna work a sh—ty paying job so [J.R.] cant [sic] get a ton of money from me," "she'll only get around 500 to 600 a month from me if shes [sic] lucky," "within[ ] a few years of my release Ill [sic] have custody of at least one of my boys," "[my] attorney is taking [J.R.] back to Court if she doesnt [sic] sign the [visitation] papers real soon," and "[J.R.] will be held in contempt of court." Franks further lewdly and disparagingly described his sex life with J.R.

When these letters failed to make J.R. agree to prison visitation, Franks wrote letters directly to J.R. on July 22, 2004 and August 2, 2004. In those letters Franks said "Dont [sic] you think you've been playing a game with me plenty long?" "If you choose to let me sign my [parental] rights away. You will not be getting any type of child support from me. I know how important money is to you," and "I just talked to both the boys on Sunday and they told me they loved and miss me very much and they wanted to see me bad. I keep telling them it should be soon."

Franks also wrote a letter to J.R.'s parents in which he urged them to "Please try to talk to [J.R.] and make her understand that her grudge against me is hurting the children," "She may not see it now but someday [her sons will] dispise [sic] her for not letting them see me. Ill [sic] let them know shes [sic] the reason they

couldn't see me," and "I dont [sic] expect [J.R.] to forgive me. But I do expect her to take a hard look at the picture and do the right thing."

When Franks' letter writing campaign is viewed in a light most favorable to the verdict and in the context of Franks' past terroristic acts, a reasonable trier of fact could have found that Franks had reason to know that the statements in his letters would send several messages to J.R., including that if she did not agree to prison visitation with his sons, Franks would punish J.R. financially; that he would cause her sons to despise her; that even in prison he still had the power to reach out and emotionally hurt and embarrass her with her friends; that he would soon be released from prison and that he would be even bigger and stronger than before; that her efforts to protect her sons were futile because once he was released from prison there was no way J.R. would be able to prevent contact; and that in the end he would obtain custody of their children. These threatened future acts, as well as the underlying acts of repeatedly sending letters in violation of the existing order for protection, are of a nature and tenor to support a finding that Franks had reason to know that his letters would cause J.R., who had been the victim of Franks' past acts of terror, to fear bodily harm or to feel extreme fear. *See Murphy*, 545 N.W.2d at 916 (explaining that when the legislature prohibited terroristic threats, it intended to deter and punish the future act threatened, as well as the underlying act constituting the threat). We therefore hold that the evidence is sufficient to support a finding that Franks knew or had reason to know that his letters would cause J.R. to feel terrorized.

### B.

■ Having concluded that the evidence is sufficient to support the second element,

we turn next to Franks' argument that the evidence was insufficient to support the third element of the pattern of harassing conduct offense. Specifically, Franks argues that the State did not prove that J.R. actually felt terrorized. This element requires that we examine J.R.'s reaction to Franks' conduct. J.R.'s testimony that she is "very scared of [Franks]" provides direct evidence that J.R. felt terrorized when contacted by Franks. As we have already stated, to terrorize means to cause "extreme fear," and "very" (as in "very scared") means "in high degree, exceedingly, extremely." *Black's Law Dictionary* 1562 (6th ed.1990). J.R.'s testimony that she felt "very scared" of Franks when he tried to contact her—by itself—is sufficient to satisfy the third element. But there is more than just J.R.'s testimony that she was "very scared" of Franks. J.R. also testified that Franks' continued attempts to contact her made her feel "fearful." And the police officer who investigated the allegations testified that J.R. had reported to the officer that she had felt afraid when she received the letters from Franks.

When viewed in a light most favorable to the verdict, J.R.'s statements that Franks' efforts to contact her made her "very scared of [Franks]" and "fearful" establish that she felt extreme fear. In addition, the trier of fact had the benefit of observing J.R.'s nonverbal conduct, demeanor, and appearance while testifying. *See State v. Caldwell*, 303 Minn. 297, 305, 227 N.W.2d 382, 387 (1975) (explaining evidence of fear and danger was sufficient where the district court had the benefit of observing the witness, his demeanor, and his fear). Our obligation is not to retry the case but to construe the evidence in the light most favorable to the verdict. *Robinson*, 536 N.W.2d at 2. The evidence is sufficient to support the third element.

In sum, we hold that the evidence was sufficient to support Franks' conviction for engaging in a pattern of harassing conduct.

## II.

Affirming Franks' conviction for a pattern of harassing conduct requires that we address the sentencing issue Franks raises. The district court did not sentence Franks on the pattern of harassing conduct conviction. Instead, the court imposed sentences on each of the four counts of violation of the order for protection, and ordered those sentences to be served consecutively. Franks contends that the court erred in not imposing sentence on the pattern of harassing conduct conviction because that crime is the more serious offense. We agree.

We have said "that section 609.035 contemplates that a defendant will be punished for the 'most serious' of the offenses arising out of a single behavioral incident because 'imposing up to the maximum punishment for the most serious offense will include punishment for all offenses.' " *State v. Kebaso*, 713 N.W.2d 317, 322 (Minn. 2006) (quoting *State v. Johnson*, 273 Minn. 394, 399, 141 N.W.2d 517, 522 (1966)).[4] In *Kebaso* we noted that "we have implicitly approved the use of the sentencing guidelines' severity-level rankings as a method

---

**4.** The State argued to the district court that the court could impose sentence for the pattern of harassing conduct or the order for protection violations, but not both. *See* Minn. Stat. § 609.035, subd. 1 (2008) ("[I]f a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses"). The State does not make any other argument on appeal and we therefore assume, but do not decide, for purposes of this appeal that Franks' order for protection violations and the pattern offense fall within the prohibition of Minn.Stat. § 609.035.

for determining which of multiple felony offenses is the most serious." *Id.* A felony violation of an order for protection is a severity level IV offense under the guidelines, whereas a pattern of harassing conduct is ranked as a severity level V offense. Minn. Sent. Guidelines V.

In *Kebaso* we also "approved" an analysis of the statutory maximums for the crime as a way of assessing which was the more serious. 713 N.W.2d at 323. In this case, the statutory maximum sentence for the pattern of harassing conduct offense is ten years in prison and a $20,000 fine. Minn.Stat. § 609.749, subd. 5(a). The statutory maximum sentence of violation of an order for protection offense is five years in prison and a $10,000 fine. Minn.Stat. § 518B.01, subd. 14(d)(1).

Consistent with the analysis in *Kebaso*, we hold that the pattern of harassing conduct crime is the more serious crime and the crime on which the district court should have imposed sentence.[5] Therefore, we vacate Franks' sentence on the four order for protection counts, and remand the case to the district court with instructions to impose sentence on Franks' pattern of harassing conduct conviction.

Affirmed in part, reversed in part, and remanded.

---

**5.** Having concluded that the district court should have imposed sentence on the pattern of harassing conduct conviction, we do not reach the issue of whether the district court erred by sentencing Franks consecutively for each violation of the order for protection.