STATE of Minnesota, Respondent,

v.

Marlon Terrell PRATT, Appellant.

No. A09–2323.

Supreme Court of Minnesota.

May 23, 2012.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, MN, for appellant.

## OPINION

PAGE, Justice.

Appellant Marlon Terrell Pratt was charged by complaint with 17 counts of theft by swindle, pursuant to Minn.Stat. § 609.52, subd. 2(4) (2010), and two counts of racketeering, pursuant to Minn.Stat. § 609.903, subd. 1 (2010). He was charged both as a principal and as an accomplice. Following a jury trial, Pratt was convicted of all 19 counts. On appeal, the court of appeals affirmed in part, reversed in part, and remanded for resentencing. This appeal followed. On behalf of Pratt, appellate counsel raises six issues. In his pro se supplemental brief, Pratt raises a number of other issues. Because we conclude Pratt is entitled to a new trial, we only need to address two of the issues presented: (1) whether there was sufficient evidence to support Pratt's theft-by-swindle convictions; and (2) whether the judge who presided over Pratt's trial was disqualified from doing so.

## I.

The facts underlying the criminal charges in the complaint arise from Pratt's employment as a loan officer with Universal Mortgage, Inc.[1] The complaint alleges that in that role, Pratt was involved in a mortgage loan fraud scheme. As a loan officer, Pratt assisted buyers in preparing purchase agreements and loan applications, which were ultimately submitted to lenders. With respect to the 17 properties involved in the complaint, Pratt prepared purchase agreements and loan applications that contained false and/or misleading information. Among other things, the purchase agreements and loan applications included inflated purchase prices for the properties involved, indicated that the properties would be owner occupied when in fact they would not be so occupied, contained falsehoods about the buyers' assets, contained falsehoods about whether down payments were borrowed, and failed to disclose that Pratt or his construction company would receive a check for a portion of the proceeds from the mortgage loans when the property transactions closed. Testimony at trial indicated that payments to the construction company were made ostensibly for construction work performed on the properties, but there was no evidence that any such work had been done. The complaint further alleges that, in reliance on these false and misleading purchase agreements and loan applications, the mortgage lenders involved were swindled out of loan funds. Under Minn.Stat. § 609.52, subd. 2(4), a person is guilty of theft by swindle if the person, "whether by artifice, trick, device, or any other means, obtains property or services from another person."

At trial, the State presented evidence describing how a typical home purchase takes place. When a homeowner agrees to sell her home to a buyer, the agreement is memorialized in a purchase agreement. The purchase agreement identifies the seller, buyer, property, and purchase price—the amount of money the buyer promises to pay the seller for the purchase of the home. If the buyer needs a loan to finance the purchase, the buyer completes a loan application and submits the purchase agreement and loan application to a bank or other lender. The loan application defines the relationship between the buyer/borrower and the lender. Among other things, it contains the loan amount the buyer requests, the purchase price, information about the buyer's ability to repay the loan (e.g., assets and income), and a

---

1. Universal was incorporated in 2002, but did not begin doing business under that name until 2005. Before 2005, Universal was doing business as Superior Mortgage, Inc.

statement of whether the buyer intends to occupy the property. Although there was no direct evidence from any of the lenders involved here establishing that they relied on any information contained in the purchase agreements or loan applications submitted by or on behalf of Pratt, there was uncontroverted evidence introduced at trial establishing that it is standard practice for lenders to rely on the purchase price, the buyer's income, whether the buyer intends to occupy the property, and whether any portion of the down payment is borrowed in making a loan. Based on that information, the lender determines whether the buyer will be able to repay the loan and thus whether to make the loan.

When a lender agrees to make a loan, the closing on the property—which is often facilitated by a title company—takes place. If a title company facilitates the closing, the title company is responsible at closing for having the buyer sign the required financing documents and then disbursing all of the funds after receiving funds from the lender. In exchange for issuing the loan, the lender receives a promissory note (indicating the buyer's promise to repay the loan) and a mortgage (enabling the lender to initiate a foreclosure if the buyer fails to repay the loan).

On April 10, 2009, retired Judge Steven Lange was assigned to preside over Pratt's trial. He presided over multiple pretrial proceedings between April 10 and June 3, the date the trial began. On July 2, 2009, while the trial was still ongoing, the State disclosed for the first time that Judge Lange had been retained by the Hennepin County Attorney's Office (HCAO) in December 2008 to be an expert witness in an unrelated federal civil case.[2]

According to Judge Lange, his involvement with the federal case began in December 2008 when he was contacted by the HCAO about the federal case. He subsequently attended a 90–minute meeting on December 23, 2008, during which he signed a confidentiality agreement, reviewed the case, and indicated what his opinion would be if he testified. On December 28, Judge Lange confirmed that he would accept the assignment to serve as an expert witness. Later, in February 2009, the HCAO provided Judge Lange with documents related to the federal case for his review. The record indicates that Judge Lange never reviewed those documents. According to Judge Lange, he had only one other contact with the HCAO about the federal case before he was assigned to preside at Pratt's trial, but he "was not asked to do anything, nor did [he] do anything" as a result of that contact. In the end, Judge Lange received no compensation related to the federal case and Judge Lange contends that he informed the HCAO on June 30 that he was no longer available to be an expert witness in the federal case. On July 7, 2009, Judge Lange returned the unreviewed February 2009 documents to the HCAO.

The State disclosed the relationship between Judge Lange and the HCAO to Pratt at the end of the day on Friday, July 2. The trial reconvened on July 6, following the holiday weekend, and jury deliberations began on July 7. On July 8, the jury found Pratt guilty of all 17 counts of theft by swindle and both counts of racketeering.

On July 9, 2009, Pratt filed a motion to disqualify Judge Lange.[3] Judge Lange

---

2. The federal case involved a civil suit against the Hennepin County Medical Center, medical personnel, and a police officer arising out of an unconsented-to medical examination of a minor performed at the medical center.

3. Although Pratt's motion was titled, "Notice to Remove," because the motion was made

heard arguments on the motion on July 20, 2009, and ultimately denied the motion. Pratt requested an evidentiary hearing on his motion before the chief judge of the Fourth Judicial District. No evidentiary hearing was held and the chief judge issued an order denying Pratt's motion to disqualify Judge Lange. Pratt filed a petition for a writ of prohibition in the court of appeals to prevent Judge Lange from presiding further in the case, which the court of appeals denied. *In re Pratt,* No. A09–1685, Order (Minn.App. filed Sept. 24, 2009). Pratt was sentenced on September 24, 2009. Judge Lange imposed concurrent sentences of 39 months for each theft-by-swindle conviction; he also imposed concurrent sentences of 120 months for each racketeering conviction—an upward departure—based on the findings of a *Blakely* jury. We subsequently granted Pratt's petition for review of the court of appeals' denial of Pratt's petition for a writ of prohibition, but later vacated our order and dismissed Pratt's petition without prejudice. *In re Pratt,* No. A09–1685, Order (Minn. filed Feb. 4, 2010).

Pratt also appealed his convictions and sentences to the court of appeals, which affirmed in part, reversed in part, and remanded. The court reversed the trial court on two issues involving Pratt's sentences, but otherwise affirmed Pratt's convictions. With respect to Pratt's claim that he is entitled to a new trial because Judge Lange was disqualified from presiding over his trial, a two-member majority of the court of appeals panel concluded that Judge Lange was disqualified from presiding at Pratt's trial. With a different combination of the panel's members making up the majority, the court nonetheless affirmed Pratt's convictions, holding that

Judge Lange's disqualification did not require reversal because Pratt had not shown prejudice. We conclude that Judge Lange was disqualified under Rule 2.11(A) of the Code of Judicial Conduct, that Pratt is entitled to a new trial, and therefore we reverse.

## II.

■ We first address Pratt's argument that the evidence was insufficient to find him guilty of theft by swindle. The elements of theft by swindle are: (i) the owner of the property gave up possession of the property due to the swindle; (ii) the defendant intended to obtain for himself or someone else possession of the property; and (iii) the defendant's act was a swindle. Minn.Stat. § 609.52, subd. 2(4); 10 Minn. Dist. Judges Ass'n, *Minnesota Practice— Jury Instruction Guides, Criminal,* CRIMJIG 16.10 (5th ed.2006). The State was required to prove each of these elements beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *see also State v. Clausen,* 493 N.W.2d 113, 116 (Minn.1992). Pratt challenges the sufficiency of the first element only—specifically, whether the State proved that the lenders gave up the loan funds *due to* the swindle. Pratt contends that the evidence was insufficient because the State presented no evidence that the lenders who made the 17 loans at issue relied on any statements Pratt made. Because no direct evidence regarding the lenders' reliance was introduced at trial, we interpret Pratt's argument as challenging the sufficiency of the circumstantial evidence related to the lenders' reliance introduced at trial. The State argues that sufficient evidence was introduced demonstrating that "lenders rely upon informa-

after Judge Lange had "presided at the trial," it was a motion to disqualify. *Compare* Minn. R.Crim. P. 26.03, subd. 14(4)(c), *with* Minn.

R.Crim. P. 26.03, subd. 14(3). Therefore, we refer to Pratt's motion as a motion to disqualify.

tion provided in loan applications as a critical element in the loan approval process."

When we assess the sufficiency of the evidence, we determine whether the legitimate inferences drawn from the facts in the record would reasonably support the jury's conclusion that the defendant was guilty beyond a reasonable doubt. *State v. Al–Naseer,* 788 N.W.2d 469, 473 (Minn. 2010). We give due regard to the defendant's presumption of innocence and the State's burden of proof, and will uphold the verdict if the jury could reasonably have found the defendant guilty. *Id.*

We apply heightened scrutiny when reviewing, as we do here, verdicts based on circumstantial evidence. "This heightened scrutiny requires us to consider whether the reasonable inferences that can be drawn from the circumstances proved support a rational hypothesis other than guilt." *Id.* (citation omitted) (internal quotation marks omitted). The circumstances proved must be consistent with a hypothesis that the defendant is guilty and must be inconsistent with any other rational hypothesis. *Id.* " 'Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt.' " *Id.* (quoting *State v. Taylor,* 650 N.W.2d 190, 206 (Minn.2002)).

The trier of fact is in the best position to determine credibility and weigh the evidence; therefore, "[w]e will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture." *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998). "In identifying the circumstances proved, 'we defer ... to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circum-

stances proved by the State.' " *State v. Andersen,* 784 N.W.2d 320, 329 (Minn. 2010) (quoting *State v. Stein,* 776 N.W.2d 709, 718 (Minn.2010) (plurality opinion)). We then independently examine the reasonableness of the inferences to be drawn from the circumstances proved, giving no deference to the jury's choice between reasonable inferences. *Id.* at 329–30.

Here, when we consider the evidence in the light most favorable to the verdict, the circumstances proved are as follows. Lenders rely on purchase agreements and loan applications when deciding whether to make real estate loans. They rely on the information contained in purchase agreements and loan applications to be truthful, accurate, and not misleading. In making their decision, they consider, among other things, the following information contained in purchase agreements and loan applications: the value of the property; the ability of the borrower to repay the loan; whether the property is to be owner occupied; whether a portion of the down payment is borrowed; and whether the borrower is to receive any portion of the proceeds from the loan and, if so, the reason for receiving a portion of the loan proceeds. Although they varied, each purchase agreement and loan application prepared and/or submitted by Pratt contained one or more pieces of information that was false or misleading. The information included the following: inflated purchase prices; false statements about borrowers' incomes; falsehoods as to the buyer's assets, including the number of properties owned by the borrower; false statements that the property would be owner occupied; and false statements with respect to whether part of the down payment was borrowed. Each lender was represented by a title company at the closing for each property. In preparation for each closing, the lender provided the title company with the applicable purchase agreement, the

loan application, and the loan funds for distribution. Finally, in each case, the amount of the loan funds approved by the lender and paid out at closing was consistent with the amount sought in the loan application.

Pratt argues that one reasonable inference to be drawn from these circumstances as proved is that the lenders would have issued the loans even if they had known the loan applications contained false and misleading statements. Pratt also argues that it is reasonable to infer that the loan applications in the record—which were provided by the title companies, not the lenders—were not reviewed by the lenders, and therefore the lenders could not have relied on any false statements contained in them. In Pratt's pro se supplemental brief, Pratt argues that the convictions cannot stand because the evidence did not establish that the lenders were permanently deprived of their loan funds. Given the circumstances proved, we conclude that Pratt's arguments have no merit.

The only reasonable inference to be drawn from the uncontradicted evidence that lenders rely on purchase agreements and loan applications when deciding whether to make real estate loans is that the lenders involved here relied on the false information contained in the purchase agreements and loan applications in deciding both to make the loans at issue here and the amount of each loan made. Further, the only reasonable inference to be drawn from the evidence that (1) the lenders provided the title companies with the purchase agreements and loan applications for closing, and (2) that the lenders issued

loan funds in amounts consistent with the amounts requested in the loan applications is that the lenders relied on the purchase agreements and loan applications to approve the loans that resulted in Pratt's convictions. We conclude, based on the circumstances proved, that the only reasonable inferences to be drawn from those circumstances are that the lenders in this case approved the loans on the 17 properties because of the purchase agreements and loan applications, and that the lenders would not have approved the loans on the 17 properties if they had known of the falsehoods and misrepresentations contained within them. Any other inference is not reasonable. Therefore, we conclude that the evidence of the lenders' reliance is sufficient to support Pratt's convictions.[4] With respect to Pratt's argument that the lenders were not permanently deprived of their loan funds, it is enough to say that the argument lacks merit because "permanent deprivation" is not an element of theft by swindle. *See* Minn.Stat. § 609.52, subd. 2(4).

## III.

■ Having concluded that the evidence is sufficient to support Pratt's convictions, we next consider whether Pratt is entitled to a new trial because the judge who presided at his trial was disqualified under the Code of Judicial Conduct. Pratt argues that the fact that Judge Lange was retained by the HCAO to be an expert witness, while at the same time presiding over Pratt's trial, would cause a reasonable examiner to question Judge Lange's impartiality, warranting disqualification and a new trial. We agree.

---

4. Pratt also argues that the evidence was insufficient to find him guilty of racketeering, but only insofar as the racketeering convictions were predicated on the theft-by-swindle convictions. Therefore, our resolution of the sufficiency of the evidence with respect to the theft-by-swindle convictions necessarily resolves Pratt's argument with respect to the racketeering convictions.

"A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." [5] Rule 1.2, Code of Judicial Conduct. Rule 2.11(A) of the Code provides that "[a] judge *shall* disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." [6] (Emphasis added.) The Code defines "impartial" and "impartiality" as the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." Terminology, Code of Judicial Conduct. Under Minn. R.Crim. P. 26.03, subd. 14(3), "[a] judge must not preside at a trial or other proceeding if disqualified under the Code of Judicial Conduct." [7] A judge is disqualified if "a reasonable examiner, with full knowledge of the facts and circumstances, would question the judge's impartiality." [8]

*In re Jacobs*, 802 N.W.2d 748, 753 (Minn. 2011). The prohibition against a judge presiding when his or her impartiality might reasonably be questioned leaves "considerable room for interpretation" and "does not provide a precise formula that can automatically be applied." *Powell*, 660 N.W.2d at 115. Whether a judge has violated the Code is a question we review de novo. *State v. Dorsey*, 701 N.W.2d 238, 246 (Minn.2005).

We conclude that a reasonable examiner would question Judge Lange's ability to be impartial. The facts and circumstances show that Judge Lange was contacted by the civil division of the HCAO to serve as an expert witness in a federal civil lawsuit. He attended one meeting about the civil case, during which he expressed what his opinion would be if he were to testify. On December 28, 2008, Judge Lange agreed to act as an expert witness in the civil case. While the record does not indicate how much Judge Lange was to be paid for his services, there is nothing in the record to

---

**5.** The comments indicate that "[c]onduct that ... appears to compromise the ... impartiality of a judge undermines public confidence in the judiciary." Rule 1.2, cmt. 3, Code of Judicial Conduct. As the U.S. Supreme Court has recognized, "[w]e must continuously bear in mind that to perform its high function in the best way justice must satisfy the appearance of justice." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)) (internal quotation marks omitted); *see also Powell v. Anderson*, 660 N.W.2d 107, 121 (Minn.2003).

**6.** The Canon in effect at the time of Pratt's trial was Canon 3D(1). The canons have since been amended; effective July 1, 2009, Canon 3D(1) is now found at Rule 2.11(A) of the Code of Judicial Conduct.

**7.** The rule in effect at the time of Pratt's trial was Minn. R.Crim. P. 26.03, subd. 13(3) (2009). It is not materially different than Minn. R.Crim. P. 26.03, subd. 14(3).

**8.** In this case, the chief judge chose "to evaluate the motion from the perspective of a chief judge." While we have never specifically identified who the "reasonable examiner" is, we have never applied the standard articulated by the chief judge. In *Jacobs*, we cited with approval cases characterizing the "reasonable examiner" as "an objective, unbiased layperson." *Jacobs*, 802 N.W.2d at 753. We take this opportunity to now say more clearly that when applying the "reasonable examiner" test under Rule 2.11(A), we apply the test from the perspective of a "reasonable examiner" who is "an objective, unbiased layperson with full knowledge of the facts and circumstances." *Jacobs*, 802 N.W.2d at 753. The Code is concerned with public perception and public trust and confidence. *See* Preamble, Minn.Code of Judicial Conduct; *see also id.* Rule 1.2. Applying Rule 2.11(A) from the perspective of a layperson is consistent with these concerns.

suggest that he agreed not to be paid as an expert witness. In February 2009, the HCAO provided documents to Judge Lange for his review in preparing for the civil case. Judge Lange never reviewed those documents before they were returned to the HCAO on July 7, 2009, and only had one other contact with the HCAO before he was assigned to preside at Pratt's trial. Still, Judge Lange's commitment to serve as an expert witness for the HCAO was unchanged as of April 10, 2009, when Judge Lange was assigned to preside over Pratt's trial.

In *Jacobs,* we concluded that a reasonable examiner would not question a judge's impartiality based on his wife's employment. *Jacobs,* 802 N.W.2d at 753. We reached that conclusion based on the following facts: the wife's employer, the HCAO, was a large organization that handled a "high volume and wide variety" of cases; although at one time the judge's spouse worked in the criminal appellate division of the HCAO, at the time of the trial, it appeared that the judge's spouse worked in another division of the HCAO; and the judge's spouse was not in a position to benefit financially from the outcome of the case before the judge and "had no personal involvement with the case." *Id.*

Unlike *Jacobs,* here it was the judge himself who was retained to provide expert witness services for the HCAO. In that regard, he was not unlike an employee of the HCAO because, as an expert witness for the HCAO, he was to act in a way that was aligned with the HCAO's interests. While the State argues that the judge was never compensated for his services, the State does not claim that, during the period that the judge was on retainer, the judge did not expect to be compensated or otherwise benefit from his relationship with the HCAO. Clearly, the judge stood to benefit financially from being retained.

That Judge Lange ultimately was not paid for his services and that he did little, if any, work in preparation for the civil trial does not alter the fact that, while presiding over a criminal trial being prosecuted by the HCAO, he was retained by the HCAO to serve as an expert witness, a fact that would cause a reasonable examiner to question the judge's ability to be impartial. A reasonable examiner might also question why Judge Lange withdrew from the relationship with the HCAO shortly before Pratt's trial ended. Further, the fact that Judge Lange was presiding over a jury trial does not alter our conclusion.

Some courts have found that merely negotiating for future employment might cause a reasonable observer to question a judge's impartiality. *See, e.g., Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985) (holding—in case in which a "headhunter" hired by the judge called firms appearing before the judge—that "recusal [was] required because of the appearance of partiality" even though the judge had "no realistic prospect of ever working for either law firm"); *DeNike v. Cupo,* 196 N.J. 502, 958 A.2d 446, 449 (2008) (holding that judge's negotiation for future employment with plaintiff's counsel created an appearance of impropriety that required disqualification); *see also Scott v. United States,* 559 A.2d 745, 746–50 (D.C. 1989) (en banc) (noting that the United States conceded that the presiding judge violated the canon that "[a] judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned" in a case in which the judge was negotiating for employment with the Department of Justice while presiding over a criminal case being prosecuted by the United States Attorney's Office). In *Pepsico,* the Seventh Circuit reasoned:

The appearance of equal justice requires that the judge not be exploring the pros-

pects of employment with one lawyer or all lawyers appearing in a case before him. The dignity and independence of the judiciary are diminished when the judge comes before the lawyers in the case in the role of a suppliant for employment. The public cannot be confident that a case tried under such conditions will be decided in accordance with the highest traditions of the judiciary.

*Pepsico,* 764 F.2d at 461. The facts of this case are more problematic than those in either *Pepsico* or *DeNike* because here the judge was actually retained by the prosecuting authority at the same time the prosecuting authority was appearing before the judge in a criminal case. *See id.* at 459–60; *DeNike,* 958 A.2d at 449–53; *see also Scott,* 559 A.2d at 747.

Rule 3.9 of the Code of Judicial Conduct provides additional guidance for our analysis. Under that Rule, a retired judge may serve as an arbitrator or mediator, but not "during the period of any judicial assignment." Rule 3.9(A), Code of Judicial Conduct. Thus, the Code proscribes a retired judge's contemporaneous service as an arbitrator or mediator and service as a judge. If a retired judge may not serve as an arbitrator or mediator in a matter unrelated to any party during a judicial assignment, certainly a judge should not be on retainer to a party appearing before him in a proceeding during a judicial assignment.

We therefore conclude that the facts and circumstances of this case would cause a reasonable examiner—with full knowledge of those facts and circumstances—to question Judge Lange's impartiality. Thus, Judge Lange was disqualified under Rule 2.11(A) from presiding at Pratt's criminal trial.

■ Having concluded that Judge Lange was disqualified under Rule 2.11(A), we next consider whether we must correct the error in order to ensure the integrity and fairness of the judicial process. We conclude that we must.[9] Justice requires that the judicial process be fair and that it appear to be fair; it necessarily follows that a presiding judge must be impartial and must appear to be impartial. To paraphrase Judge Posner, writing for the court in *Pepsico,* the public cannot be confident that a case tried by a judge who is on retainer by one of the parties to the case will be decided in accordance with the highest traditions of the judiciary. *See Pepsico,* 764 F.2d at 461. Put another way, the public cannot have trust and confidence in a judicial system that permits the presiding judge in a case to be simultaneously retained as an expert witness by one of the parties appearing before the judge. Moreover, reversing in this case will have prophylactic value. *See Scott,* 559 A.2d at 755.

Because Judge Lange's relationship with the HCAO would cause a reasonable examiner to question his impartiality and reversal is required to maintain the public's confidence in the independence, integrity,

---

9. Pratt argues that we should apply structural error and reverse without considering whether or not Pratt was prejudiced by Judge Lange's having presided at his trial. The State argues that Pratt has shown no prejudice and therefore we should, as the court of appeals did and as the concurrence suggests, apply the *Liljeberg* factors as we did in *Powell v. Anderson.* 660 N.W.2d at 120–24; *see Liljeberg,* 486 U.S. at 864, 108 S.Ct. 2194. The *Liljeberg* factors are: (1) "the risk of injustice to the parties in the particular case," (2) "the risk that the denial of relief will produce injustice in other cases," and (3) "the risk of undermining the public's confidence in the judicial process." *Liljeberg,* 486 U.S. at 864, 108 S.Ct. 2194. Based on the facts presented here, we need not decide which of the standards proposed by the parties apply as a general rule in cases involving violations of Rule 2.11(A) because, under either of the standards, Pratt is entitled to a new trial.

and impartiality of the judiciary, we reverse Pratt's convictions and remand to the district court for further proceedings consistent with this opinion.[10]

Reversed and remanded.

Concurring, DIETZEN and STRAS, JJ.

DIETZEN, Justice (concurring).

I agree with the outcome reached by the majority and its conclusion that Judge Lange was disqualified under Rule 2.11(A) of the Code of Judicial Conduct. But I would adopt the *Liljeberg* factors to determine whether Judge Lange's disqualification should result in vacating Pratt's conviction. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).

In *Liljeberg*, the U.S. Supreme Court considered whether a federal district judge should have recused himself and whether his failure to do so required vacation of the judgment. *Id.* at 850, 108 S.Ct. 2194. The case involved a declaratory judgment action to determine ownership of a corporation. *Id.* The plaintiff filed a motion to vacate the judgment and for a new trial based on the contention that the trial judge should have recused himself because he was a trustee of the university that had an interest in the litigation. *Id.* at 850–51, 108 S.Ct. 2194. After denial of the motion, the court of appeals reversed and remanded to a different judge for additional factual findings. *Id.* at 851, 108 S.Ct. 2194. The district court again denied the plaintiff's motion, and the court of appeals reversed the district court and vacated the declaratory judgment. *Id.* at 851–52, 108 S.Ct. 2194. Subsequently, the U.S. Supreme Court granted the defendant's petition for writ of certiorari and affirmed the court of appeals. *Id.* at 850, 108 S.Ct.

2194. The Court held that the district judge violated a federal statute by failing to disqualify himself from litigation and that the judge's failure to do so in violation of the statute required vacation of the judgment. *Id.* at 861, 867–68, 870, 108 S.Ct. 2194. In doing so, the Court concluded that the following factors should be considered in determining whether to vacate the judgment: (1) "the risk of injustice to the parties in the particular case," (2) "the risk that the denial of relief will produce injustice in other cases," and (3) "the risk of undermining the public's confidence in the judicial process." *Id.* at 864, 108 S.Ct. 2194. In my view, this court should adopt the *Liljeberg* factors to determine the appropriate remedy upon the disqualification of a judge.

Applying these factors, I would conclude that there is a risk of injustice to Pratt in having a "disqualified" judge hear the case. First, although the State would be required to retry the case, the State was aware of the conflict issue at the time of the trial but chose not to bring it to the defendant's attention. The State should bear the consequences of its decision. Second, there is a risk that the denial of relief in this case will produce injustice in other cases. Specifically, if the court does not vacate the judgment in this case, there will be little incentive for other similarly situated parties to timely bring a conflict issue to the attention of the court and the other parties. Third, the failure to vacate the conviction in this case will risk undermining the public's confidence in the judicial process. The citizens of Minnesota rely on the court to be vigilant in making sure that all cases will be decided in accordance with the highest traditions of the judiciary. Based upon those factors, I

10. Having reversed Pratt's convictions because the trial judge was disqualified, we

need not and therefore do not reach the remaining issues raised by Pratt.

would conclude that vacation of the judgment is appropriate in this case.

STRAS, Justice (concurring).

I join in the concurrence of Justice Dietzen.