*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0245**

State of Minnesota,
Respondent,

vs.

Jesus Armando Puente,
Appellant.

**Filed January 19, 2016
Affirmed
Schellhas, Judge**

Sherburne County District Court
File No. 71-CR-13-1825

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Kathleen A. Heaney, Sherburne County Attorney, Tim Sime, Assistant County Attorney, Elk River, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Renée Bergeron, Special Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Schellhas, Presiding Judge; Cleary, Chief Judge; and

Randall, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**SCHELLHAS**, Judge

Appellant challenges the sufficiency of the evidence to support his convictions of first-degree assault and pattern of stalking conduct.[1] He also challenges his sentence, arguing that the district court abused its discretion by denying his motion for a downward durational departure. We affirm appellant's convictions and sentence.

**FACTS**

Appellant Jesus Armando Puente and T.P. married in August 2003, had two children together, and separated in August 2012. On August 13, 2012, the district court issued a one-year order for protection (OFP) following a hearing at which both Puente and T.P. appeared. The OFP prohibited Puente from having any contact with T.P. or being within 150 feet of T.P.'s residence. In February 2013, Puente was convicted of violating the OFP in October 2012. On August 9, 2013, the district court extended the OFP through August 14, 2014. On September 19, 2013, based on an agreement between Puente and T.P., the court amended the OFP to permit personal contact initiated by T.P. away from her residence, telephone contact between Puente and T.P. regarding the children's welfare and

---

[1] Appellant also challenges the sufficiency of the evidence to support unadjudicated guilty verdicts on charges of second- and fourth-degree assault. We do not address this challenge. *See State v. Hoelzel*, 639 N.W.2d 605, 609 (Minn. 2002) (concluding that district court's finding of guilt was not appealable in absence of official judgment of conviction or conviction order entered by court); *cf. State v. Ashland*, 287 N.W.2d 649, 650 (Minn. 1979) (declining to address sufficiency of evidence for jury's guilty verdict on offenses of which defendant was not formally adjudicated guilty and for which defendant was not sentenced).

2

between Puente and the children, and two hours of parenting time for Puente every other week and such additional time as agreed to by T.P.

On December 28, 2013, after an agreed-to sledding outing with T.P. and the children, Puente entered T.P.'s vehicle and refused to exit it for about 45 minutes. He then called T.P.'s phone 886 times between 6 p.m. on December 28 and 2:50 a.m. on December 29. Puente also called T.P.'s phone 132 times on December 30 and sent at least one threatening text message. On the evening of December 30, Puente pulled up in front of T.P.'s house in a full-size pickup truck. Lieutenant Sam Olson of the Big Lake Police Department approached the truck's open passenger window, rested his left arm on the window frame, and announced his intention to arrest Puente for violating the OFP. Puente drove away at about 15 to 25 miles per hour with Lt. Olson's jacket caught in the window. Lt. Olson lost his footing when he could not free his arm from the moving truck, and Puente dragged him about 100 feet before stopping the truck.

Respondent State of Minnesota charged Puente with first-degree assault (deadly force against peace officer), second-degree assault (dangerous weapon), fourth-degree assault (demonstrable bodily harm to peace officer), gross-misdemeanor violation of an OFP (within ten years of prior conviction), stalking, and pattern of stalking conduct. A jury found Puente guilty as charged. The district court adjudicated Puente guilty of first-degree assault, stalking, and pattern of stalking conduct; the court took no action on the guilty verdicts for second-degree assault, fourth-degree assault, and violation of an OFP. The court denied Puente's motion for a downward durational departure and sentenced him to

3

122 months' imprisonment for first-degree assault, 15 months' concurrent imprisonment for stalking, and 28 months' concurrent imprisonment for pattern of stalking conduct.

This appeal follows.

## DECISION

### *Sufficiency of evidence*

When reviewing a jury verdict, an appellate court considers whether the legitimate inferences drawn from the evidence would reasonably support the jury's conclusion that the defendant was guilty beyond a reasonable doubt. *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). Appellate review is limited to a close analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jury to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). The reviewing court must assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). The reviewing court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn. 2004).

The state must prove every element of a charged offense. *See State v. Struzyk*, 869 N.W.2d 280, 289 (Minn. 2015) ("It is axiomatic that it is the State's burden to prove every element of the charged offense."). "The State ordinarily proves a [person]'s mental state by circumstantial evidence." *See State v. Bahtuoh*, 840 N.W.2d 804, 809 (Minn. 2013). Minnesota courts employ a two-step process when reviewing convictions based on

4

circumstantial evidence. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010). First, the reviewing court identifies the circumstances proved. *Id.* In doing so, the court views the evidence "in the light most favorable to the verdict." *Pratt*, 813 N.W.2d at 874. The court defers to the fact-finder's acceptance and rejection of evidence and to its credibility determinations. *Andersen*, 784 N.W.2d at 329; *see also State v. Hughes*, 749 N.W.2d 307, 312 (Minn. 2008) (stating that juries are "in the best position to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony").

Next, the reviewing court examines the reasonableness of the inferences that can be drawn from the circumstances proved, including inferences of innocence, as well as guilt. *Andersen*, 784 N.W.2d at 329. The circumstances proved must be consistent with guilt and inconsistent with any other rational hypothesis negating guilt. *Id.* at 330. The reviewing court does not defer to the fact-finder's choice between reasonable inferences. *Id.* at 329–30. Appellate courts "view the circumstantial evidence as a whole, not as isolated facts." *State v. Hurd*, 819 N.W.2d 591, 599 (Minn. 2012). The "[s]tate does not have the burden of removing all doubt, but of removing all reasonable doubt." *State v. Al–Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). Lastly, a rational hypothesis negating guilt must be based on more than mere conjecture or speculation. *See Andersen*, 784 N.W.2d at 330 (stating that [appellate courts] will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture" (quotation omitted)).

*Pattern of stalking conduct*

> A person who engages in a pattern of stalking conduct with respect to a single victim . . . which the actor knows or has reason to know would cause the victim under the circumstances to feel terrorized or to fear bodily harm and which does cause this reaction on the part of the victim, is guilty of a felony.

Minn. Stat. § 609.749, subd. 5(a) (2012). "[A] 'pattern of stalking conduct' means two or more acts within a five-year period that violate or attempt to violate the provisions of [specified statutes]," including "section 518B.01, subdivision 14 (violations of domestic abuse orders for protection)." *Id.*, subd. 5(b) (2012). "[T]he phrase feel terrorized in Minn.Stat. 609.749, subd. 5 means to 'feel extreme fear resulting from violence or threats.'" *State v. Franks*, 765 N.W.2d 68, 74 (Minn. 2009). "[T]he State does not have to prove that the conduct amounted to an express threat." *Id.* at 75. Rather, "[t]he test of whether words or phrases are threatening is the context in which they are used." *Id.* "Finally, it is proper to view a defendant's words and acts in the context of the defendant's relationship with the victim, including evidence of past crimes against the victim." *Id.*

In this case, the district court convicted Puente of pattern of stalking conduct based on his October 2012 and December 2013 violations of the OFP. Puente argues that the state failed to prove beyond a reasonable doubt that (1) "Puente knew or should have known his conduct would cause [T.P.] to 'feel extreme fear resulting from violence or threats' or to fear bodily harm" and (2) Puente's conduct caused T.P. to experience such extreme fear.

Pertinent to Puente's and T.P.'s mental states, the circumstances proved are:

> (1) In October 2012, about two months after T.P. sought and received an OFP prohibiting Puente from having any

6

contact with T.P. or being within 150 feet of her residence, Puente sent T.P. a text message that said, "If you don't answer your phone I'm going to come to the house"; went to T.P.'s house; rang the doorbell, knocked on the front door, and tried to talk with T.P. for about two hours; and eventually became angry and kicked the door twice.

(2) Puente's October 2012 violation of the OFP caused T.P. to feel "annoyed," "upset," and "angry."

(3) On December 28, 2013, Puente got into the backseat of T.P.'s vehicle with the children and would not get out of the vehicle for about 45 minutes despite T.P.'s "[c]ontinuous[]" requests that he get out.

(4) When Puente refused to leave T.P.'s vehicle on December 28, 2013, T.P. felt "[a]nnoyed and just tired and done"; secretly called 911, hoping for police assistance, and "let the phone just kind of sit there" while Puente was in the vehicle; saw that one of the children was "really upset" and "visibly shaken" by the incident; and reported the incident to police.

(5) Soon after the December 28, 2013 incident, Puente began calling T.P.'s phone "constantly" or "continuous[ly]," calling 886 times between 6 p.m. on December 28 and 2:50 a.m. on December 29 and calling 132 times on December 30, for a total of over 1,000 calls in about 48 hours; Puente also sent T.P. a text message that said, "If you don't answer the phone I'm going to come to the house with police."

(6) Puente continued to call T.P.'s phone even after she tried to block the calls, told him to stop, told him that she was going to seek another amendment of the OFP to prohibit all contact, and stopped answering the calls.

(7) The December 28–30, 2013 phone contact was out-of-character for Puente and "really stressful" for T.P.; caused T.P. to feel "irritated," "harassed," "worried," "stressed out," "annoyed," "fearful . . . of what might happen," "upset," and powerless to stop the contact; caused T.P. to be uncertain and worry about whether Puente was going to come to her house in violation of the OFP; prevented T.P. from using her phone at

7

times; prompted T.P. to seek another amendment of the OFP to prohibit all contact; and induced T.P. to call police, ask what would happen if Puente came to her house, and request police assistance.

(8) After dark on December 30, 2013, while at her house with the children, T.P. started "peeking out the window to see if [Puente] was going to drive by," feeling "fearful"; saw Puente drive a truck by her house and pull up within 150 feet of her house; thought, "Uh-oh, something might happen," still feeling "fearful"; saw Puente interact with police officers and then saw the truck "fl[y]" off "fast," taking one officer with it; felt "shocked," "worried," and "concerned"; and found the incident "scary."

These circumstances are consistent with reasonable inferences that, within the context of the relationship between Puente and T.P., (1) Puente knew or had reason to know that his repeated violations of the OFP were threatening and would cause T.P. "to feel extreme fear resulting from . . . [the] threats" and (2) Puente's repeated violations of the OFP did cause T.P. "to feel extreme fear resulting from . . . [the] threats." *See* Minn. Stat. § 609.749, subd. 5 (2012); *Franks*, 765 N.W.2d at 74 (quotation omitted). Furthermore, when viewed in the light most favorable to the guilty verdict, the circumstances proved are inconsistent with any rational hypotheses except that (1) Puente at least had reason to know that his OFP violations would cause T.P. to feel extreme fear and (2) the violations did cause T.P. to feel extreme fear. *See Franks*, 765 N.W.2d at 74, 77 ("[An appellate court's] obligation is not to retry the case but to construe the evidence in the light most favorable to the verdict."). We therefore conclude that the evidence was sufficient to convict Puente of pattern of stalking conduct.

*First-degree assault (deadly force against peace officer)*

"'Assault' is: (1) an act done with intent to cause fear in another of immediate bodily harm or death; or (2) the intentional infliction of or attempt to inflict bodily harm upon another." Minn. Stat. § 609.02, subd. 10 (2012). An act done with intent to cause fear in another of immediate bodily harm or death is known as assault-fear, and the intentional infliction of or attempt to inflict bodily harm upon another is known as assault-harm. *Struzyk*, 869 N.W.2d at 286 n.2. Assault-fear requires specific intent; that is, the defendant must have performed a volitional act while intending to cause another person to fear immediate bodily harm or death. *State v. Fleck*, 810 N.W.2d 303, 309 (Minn. 2012). Completed assault-harm requires only general intent; that is, the defendant merely must have performed a volitional act that resulted in bodily harm to another person. *Id.* at 308–10, 312 n.5.

"Whoever assaults a peace officer . . . by using or attempting to use deadly force against the officer . . . while the officer . . . is engaged in the performance of a duty imposed by law" is guilty of first-degree assault. Minn. Stat. § 609.221, subd. 2(a) (2012). "'[D]eadly force' means force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm." Minn. Stat. § 609.066, subd. 1 (2012). Driving a vehicle while another person is on the exterior of the vehicle may constitute deadly force. *See State v. Bernardi*, 678 N.W.2d 465, 468–69 (Minn. App. 2004) (concluding that state presented sufficient evidence of deadly force where "jury could have found that [defendant] drove [a] car at about 30 miles an hour for at least 120 feet with [a police officer] lying on the hood," reasoning that "jury

9

could have concluded that [defendant] reasonably should have known that his conduct created a substantial risk that [the officer] would fall off or under or in front of the car and could be run over by the moving vehicle, or strike his head on the car, or strike his head on the pavement, any of which events could result in [the officer]'s death or great bodily harm").

In this case, Puente was convicted of first-degree assault (deadly force against peace officer) based on his conduct of driving a truck while Lt. Olson was hanging on its exterior. Puente attacks the sufficiency of the evidence to prove the deadly-force element of the offense, arguing that "the state did not prove beyond a reasonable doubt that he [drove the truck] with a purpose to scare [Lt.] Olson or with the knowledge that his [driving conduct] created a substantial risk of causing [Lt.] Olson death or great bodily harm." Puente thereby fails to acknowledge that the deadly-force element also is satisfied by proof beyond a reasonable doubt that Puente reasonably should have known that his driving conduct created a substantial risk of causing death or great bodily harm to Lt. Olson. *See* Minn. Stat. § 609.066, subd. 1.

As relevant to Puente's mental state during his driving conduct, the circumstances proved are:

> (1) After dark on December 30, 2013, Puente was sitting in a full-size pickup truck within 150 feet of T.P.'s house, in violation of the OFP.

> (2) Lt. Olson approached the truck on foot, rested his left arm on the "open window door frame" of the passenger side of the truck, told Puente that he was in violation of the OFP, and announced an intention to arrest Puente.

10

(3) Puente looked at Lt. Olson and said, "F-ck you"; put the truck in gear; started putting up the truck's passenger window; ignored Lt. Olson's command to stop; accelerated quickly; and drove away at about 15 to 25 miles per hour.

(4) Lt. Olson's jacket became "caught in the [truck's] window, between the window and the door frame"; Lt. Olson was unable to free his left arm from the truck, lost his footing, started to "drag" next to the truck, and felt his left foot hit the truck's tire "a couple times."

(5) While driving, Puente knew that Lt. Olson was hanging on the exterior of the truck, heard Lt. Olson say that he was being dragged, and ignored Lt. Olson's commands to stop.

(6) Lt. Olson steadied himself with his left arm, grabbed his duty weapon with his right hand, put the gun through the open passenger window, and yelled at Puente to stop the truck or be shot.

(7) Puente "looked over at [Lt. Olson] and then looked forward and continued driving," so Lt. Olson again yelled at Puente to stop or be shot.

(8) Puente stopped the truck abruptly, and Lt. Olson fell to the ground, bruising his right arm and right knee area and causing soreness and pain that lasted "[a] couple weeks."

These circumstances are consistent with a reasonable inference that Puente either drove the truck with the purpose of causing, or reasonably should have known that his driving conduct created a substantial risk of causing, death or great bodily harm to Lt. Olson. *See* Minn. Stat. §§ 609.066, subd. 1, .221, subd. 2(a); *Bernardi*, 678 N.W.2d at 468–69. Furthermore, when viewed in the light most favorable to the guilty verdict, the circumstances proved are inconsistent with any rational hypothesis except that Puente at least reasonably should have known that his driving conduct created a substantial risk of

causing death or great bodily harm to Lt. Olson. *See Franks*, 765 N.W.2d at 77. Accordingly, we conclude that the evidence was sufficient to convict Puente of first-degree assault.

***Downward durational departure***

"[Appellate courts] review sentencing decisions for an abuse of discretion." *State v. Kangbateh*, 868 N.W.2d 10, 14 (Minn. 2015). A district court abuses its discretion by granting a downward departure that results in a sentence less than the mandatory minimum. *See State v. Rausch*, 799 N.W.2d 19, 20 (Minn. App. 2011) (stating in syllabus that "[i]n the absence of express authorization by the legislature, a district court is without authority to disregard a statutory mandatory-minimum sentence"); *cf. State v. Olson*, 325 N.W.2d 13, 18 (Minn. 1982) (stating that "the legislature may restrict the exercise of judicial discretion in sentencing . . . by providing for mandatory sentences").

"Whether [a statute] requires a mandatory minimum term of incarceration is a question of statutory construction which [appellate] court[s] review[] de novo." *State v. Bluhm*, 676 N.W.2d 649, 651 (Minn. 2004). "The objective of statutory interpretation is to ascertain and effectuate the Legislature's intent." *Struzyk*, 869 N.W.2d at 284. "If the Legislature's intent is clear from the statute's plain and unambiguous language, then [appellate courts] interpret the statute according to its plain meaning without resorting to the canons of statutory construction." *Id.* at 284−85 (quotation omitted).

Minnesota law provides that a person convicted of first-degree assault (deadly force against peace officer)

shall be committed to the commissioner of corrections for not less than ten years . . . . A defendant convicted and sentenced as required by this paragraph is not eligible for probation, parole, discharge, work release, or supervised release, until that person has served the full term of imprisonment as provided by law . . . .

Minn. Stat. § 609.221, subd. 2(b) (2012). The language of this statute is plain and unambiguous: Any sentence for first-degree assault (deadly force against peace officer) must include an executed term of imprisonment for at least 120 months. *See id.*; *see also State v. Leathers*, 799 N.W.2d 606, 608 (Minn. 2011) (stating that "[t]he offense [of first-degree assault (deadly force against peace officer)] is subject to a minimum sentence").

Puente nevertheless argues that the district court had discretion to disregard the statutory requirement of a minimum sentence and grant his motion for a 60-month downward departure. He offers no legal authority in support of this argument, and we have found none. Because the shortest presumptive sentence for Puente's conviction of first-degree assault was less than the mandatory minimum sentence for that offense, the district court had no discretion to grant a downward durational departure.[2] *See Rausch*, 799 N.W.2d at 20. The court's denial of Puente's departure motion therefore was not an abuse of discretion.

---

[2] The district court sentenced Puente for first-degree assault based on a criminal-history score of 3. Puente's presumptive sentence was 122 months' imprisonment, with a permissive range of 104 to 146 months' imprisonment. *See* Minn. Sent. Guidelines 4.A (establishing presumptive sentence of 122 months' imprisonment, with permissive range of 104 to 146 months' imprisonment, for severity-level 9 offense with criminal-history score of 3), 5.A (providing that first-degree assault is severity-level 9 offense) (2012).

Puente also appears to argue that we should "reverse [his] 122 month sentence and remand to the district court for imposition of a lesser sentence that is appropriate under these circumstances" because his sentence is "unreasonable, inappropriate, excessive, [or] unjustifiably disparate" under Minn. Stat. § 244.11, subd. 2(b) (2012). Puente admits that his driving conduct "was a volitional act" yet claims that "it was [done] without the malice or *mens rea* to deliberately put [Lt.] Olson in fear or in actual danger." According to Puente, his "lack of *mens rea*" lessens his culpability and warrants our "[e]xercise of . . . authority" to reverse his sentence.

In so claiming, Puente falsely equates general intent with a lack of mens rea, citing a law review article in support of the notion that *Fleck*'s holding that assault-harm is a general-intent crime "diminishes the integrity of the criminal law in that it exaggerates the criminality of the merely volitional actor, such as Puente, and ignores the legislative definition of 'assault.'" But we are bound by *Fleck*'s interpretation of the statutory definition of "assault." *See State v. Rohan*, 834 N.W.2d 223, 227 (Minn. App. 2013) (stating that "when the supreme court has already construed a statute, this court is bound by that interpretation"), *review denied* (Minn. Oct. 15, 2013). Puente's general intent was sufficient to support his conviction of first-degree assault (deadly force against peace officer), an offense that carries a mandatory minimum sentence of 120 months' imprisonment. *See* Minn. Stat. § 609.221, subd. 2(b). We do not believe that Puente's 122-month sentence is "unreasonable, inappropriate, excessive, [or] unjustifiably disparate." *See* Minn. Stat. § 244.11, subd. 2(b).

**Affirmed.**

14