*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-1494**

State of Minnesota,
Respondent,

vs.

Areial Jean Stoecker,
Appellant.

**Filed June 13, 2016**
**Affirmed**
**Bjorkman, Judge**

Wadena County District Court
File No. 80-CR-14-501

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Kyra L. Ladd, Wadena County Attorney, Brice M. Norton, Assistant County Attorney, Wadena, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bjorkman, Presiding Judge; Peterson, Judge; and Kalitowski, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**BJORKMAN**, Judge

Appellant challenges her fourth-degree-assault conviction, arguing that the evidence is not sufficient to prove that she intentionally struck an emergency medical worker. We affirm.

**FACTS**

Appellant Areial Jean Stoecker resides in a duplex owned by her grandmother C.B. in Wadena. On April 22, 2014, Officer Norman Pettis of the Wadena Police Department was called to the duplex to help locate Stoecker's brother. Stoecker was upset by the "commotion" inside the duplex, and decided to relax on a swing in the backyard.

C.B. eventually told the officers to leave. As Officer Pettis exited the residence into the backyard, he saw Stoecker fall face-forward off of the swing. He ran toward Stoecker and noticed that she was lying on her stomach and shaking. C.B. and L.O.—Stoecker's mother—also approached Stoecker, indicating that Stoecker was having a seizure. Officer Pettis also thought Stoecker was having a seizure.

An ambulance crew arrived within five minutes. The crew consisted of T.K. (a paramedic), J.W. (an emergency medical technician), and a student trainee. T.K. and J.W. are trained in how to recognize when someone is having a seizure and how to assist those individuals. T.K. and J.W. can also recognize common characteristics that individuals exhibit following a seizure, during what is called the postictal state. Those characteristics typically include grogginess, disorientation, and exhaustion.

When the ambulance crew arrived at the duplex, they were informed that Stoecker had a possible seizure. Because they were also notified that she had fallen and hit her head, J.W. retrieved a neck collar and backboard. T.K. approached Stoecker, who was lying on her right side on the ground, and noticed that she was conversing with the people around her. T.K. identified himself and asked Stoecker questions "to determine her orientation of person, place, time, [and] event." Stoecker was able to answer T.K.'s questions, and, according to T.K., seemed "very coherent." T.K. observed that Stoecker did not appear to be seizing or in a postictal state.

T.K., J.W., and Officer Pettis then attempted to roll Stoecker onto the backboard in order to stabilize her for transport to the hospital. Stoecker began to "jerk and thrash out very aggressively." Stoecker then looked directly at T.K., made her right hand into a fist, and punched him twice in the groin. T.K. and J.W. believed Stoecker's action was deliberate and was not a push, slap, or a defensive motion. According to T.K., Stoecker was completely oriented and appeared to know what she was doing.

Stoecker's family members then told the ambulance crew that they had not called them and that they should leave. Before they left, T.K. and J.W. asked Stoecker to sign a form indicating that she refused treatment. Stoecker answered all of the questions related to the release and then signed it. Neither T.K. nor J.W. had concerns about whether Stoecker had the mental capacity to refuse treatment. The ambulance crew then left the scene.

Stoecker testified that she recalled sitting on the swing and the next thing she remembered was being in her mother's lap. She also recalled that a member of the

ambulance crew asked her "to sign the computer," but she had no recollection of striking T.K. Stoecker stated that she had a "medical episode" that day, but did not intentionally hit anyone. C.B. testified that Stoecker has had seizures since she was a young child because of a chemical imbalance in her brain. At times, C.B. has seen Stoecker "strike out" at other individuals during a seizure and not remember the incident later. C.B. thought Stoecker was having a seizure on the day in question. And C.B. testified that Stoecker "really wasn't coherent" after she struck T.K.

At the conclusion of the trial, the district court instructed the jury on the elements of fourth-degree assault of an emergency medical worker. The instructions informed the jury that "[a]n assault is the intentional infliction of bodily harm upon another." The jury found Stoecker guilty. Stoecker appeals.

## D E C I S I O N

Stoecker argues that the state did not prove that she intended to strike T.K.[1] When reviewing the sufficiency of the evidence, "we determine whether the legitimate inferences drawn from the facts in the record would reasonably support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). "We give due regard to the defendant's presumption of innocence and the [s]tate's burden of proof, and will uphold the verdict if the jury could reasonably have found the defendant guilty." *Id*.

---

[1] Stoecker only challenges the sufficiency of the evidence with respect to the intent element of the assault offense.

To support a conviction of fourth-degree assault, the state was required to prove that Stoecker intentionally inflicted or attempted to inflict bodily harm upon a member of an emergency medical services personnel unit. Minn. Stat. §§ 609.02, subd. 10(2) (defining assault), .2231, subd. 2(1) (defining fourth-degree assault) (2012). "[A]ssault-harm, as defined by Minn. Stat. § 609.02, subd. 10(2), is a general-intent crime." *State v. Fleck*, 810 N.W.2d 303, 309-10 (Minn. 2012). Although a general-intent crime does not require proof that the defendant intended to cause a particular result, the state must prove that "the defendant engaged intentionally in specific, prohibited conduct." *State v. Pederson*, 840 N.W.2d 433, 436 (Minn. App. 2013) (quotation omitted). In other words, "[t]he defendant must have engaged in a volitional act and not merely acted accidentally." *Id*.

Because intent involves the defendant's state of mind, it is generally established through circumstantial evidence.[2] *Id*. We apply a two-step analysis when reviewing a conviction supported by circumstantial evidence. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). First, we identify the circumstances proved, which are the circumstances supporting the jury's verdict. *Id*. at 598-99. "The second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014) (quotations omitted).

---

[2] The state argues that the testimony of T.K. and J.W. was direct evidence of Stoecker's intent. But the jury was required to make inferences about Stoecker's state of mind in light of the observations of T.K. and J.W. Therefore, the circumstantial-evidence standard applies. *See State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997) (stating that intent is a state of mind that is generally proved circumstantially).

5

In determining the circumstances proved, it is not our role to weigh the evidence. *State v. Stein*, 776 N.W.2d 709, 714 (Minn. 2010). Rather, "we assume that the jury resolved any factual disputes in a manner that is consistent with the jury's verdict." *Moore*, 846 N.W.2d at 88. We construe conflicting evidence in the light most favorable to the verdict, and assume the jury believed the state's witnesses and disbelieved the defendant's witnesses. *Id.*

The circumstances proved establish the following facts. On April 22, Officer Pettis was in the backyard of a duplex in Wadena and saw Stoecker fall face-first off of a swing. An ambulance crew including T.K. and J.W. was called to the scene. T.K. and J.W. have been trained in how to recognize when someone is having a seizure or is in a postictal state. Upon arriving at the duplex, the ambulance crew found Stoecker lying on her right side on the ground. Stoecker was able to respond to multiple questions from T.K. before the ambulance crew tried to move her. In order to stabilize her for transport, Officer Pettis, T.K., and J.W. attempted to roll Stoecker onto a backboard. During this process, Stoecker began to "jerk and thrash out." Then she looked straight at T.K., made her right hand into a fist, and struck him twice in the groin. Based on their training and experience, T.K. and J.W. did not believe Stoecker was having a seizure or in a postictal state when she struck T.K. Stoecker then answered multiple questions and signed a form to refuse medical treatment. Neither T.K. nor J.W. had concerns about Stoecker's ability to understand the document she signed.

Stoecker does not dispute that the circumstances proved are consistent with guilt. But she argues that they are also consistent with the hypothesis that her actions resulted

from involuntary movement caused by a seizure. We are not persuaded. Stoecker's hypothesis rests on her own statement that she did not intentionally strike anyone, and C.B.'s testimony that Stoecker was having a seizure at the time of the incident. But the jury rejected this evidence. Because the circumstances proved were that Stoecker was coherent when she struck T.K. twice, the only rational hypothesis is that she intended to strike him. On this record, we conclude that sufficient evidence supports Stoecker's conviction.

**Affirmed.**