*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0117**

State of Minnesota,
Respondent,

vs.

Jeffrey Velt Murray,
Appellant.

**Filed February 26, 2024
Affirmed in part, reversed in part, and remanded
Gaïtas, Judge**

Hennepin County District Court
File No. 27-CR-21-18980

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Zachary Stephenson, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Wheelock, Presiding Judge; Smith, Tracy M., Judge; and Gaïtas, Judge.

**NONPRECEDENTIAL OPINION**

**GAÏTAS**, Judge

Appellant Jeffrey Velt Murray challenges his convictions, following a court trial, for second-degree intentional murder, second-degree felony murder, and unlawful possession of a firearm. Murray argues that the district court judge exhibited bias and made

erroneous factual findings. Additionally, he contends that the formal judgment of conviction for second-degree felony murder must be vacated because it is an included offense of second-degree intentional murder. Lastly, he raises several issues in his pro se supplemental brief, including that the district court misapplied the law of self-defense and that he received ineffective assistance of counsel. Because Murray received a fair trial and decisive evidence supports his convictions, we affirm in part. We further determine that Murray is not entitled to relief on the basis of his pro se arguments. But because the warrant of commitment shows convictions for both second-degree intentional murder and the included offense of second-degree felony murder, we reverse in part and remand with instructions to vacate the formal judgment of conviction for second-degree felony murder.

**FACTS**

In September 2021, 59-year-old D.B. died after a shooting in a Minneapolis apartment. Following an investigation into D.B.'s death, respondent State of Minnesota charged Murray with second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2020); second-degree felony murder, Minn. Stat. § 609.19, subd. 2(1) (2020); and unlawful possession of a firearm, Minn. Stat. § 624.713, subd. 1(2) (2020). Murray waived his right to a jury trial and agreed to have a court trial.

At trial, there were two very different accounts of the events that led to D.B.'s death. D.B.'s girlfriend, P.G., testified on behalf of the state that she observed Murray shoot D.B. without provocation. The state also presented the testimony of police officers, medical personnel, and forensic analysts, and offered video recordings from the responding officers' body-worn cameras, surveillance videos from the apartment building, and

2

ballistics reports, among other evidence. Murray, relying on a theory of self-defense, testified that D.B. fired the first shot, and that he shot D.B. only to protect himself.

The evidence presented at trial is summarized as follows. P.G. told the district court that she and D.B. were in the bedroom of their apartment in the early morning hours. She testified that Murray, who sold drugs, called D.B. on his cell phone from outside the apartment building shortly before 2:00 a.m. When D.B. did not answer the call, P.G. recalled that Murray began yelling up to their bedroom window. P.G. testified that she urged D.B. not to respond because of the late hour. But, according to P.G., another tenant admitted Murray to the building, and he soon appeared at their apartment door. P.G. testified that D.B. answered the door and let Murray into the apartment.

According to P.G., she was in the bedroom, lying in bed, watching videos with her face toward the wall. D.B. and Murray came into the bedroom to talk. P.G. testified that Murray sat in a chair and D.B. sat on the side of the bed. Although P.G. was wearing headphones, the volume was low enough that she could hear the conversation between the two men. P.G. testified that Murray asked D.B. whether he could borrow D.B.'s gun. D.B. responded that his gun was not in the apartment. According to P.G., Murray then "looked strange[ly]" at D.B. The conversation moved on to other topics, and Murray looked as if he was getting ready to leave. P.G. testified that D.B. asked Murray to get him some juice from the kitchen. Then, according to P.G., Murray "got up and took a couple of steps, and he shot [D.B.]."

P.G. testified that D.B. said, "He shot me. He shot me," and Murray responded, "Give it up. Give it up." D.B. ordered P.G. to move the pillow on the bed, and she did.

3

Underneath the pillow was D.B.'s gun. According to P.G., D.B. slid the gun partway across the bed to Murray, who picked it up and shot D.B. one or two more times. P.G. testified that Murray had two guns at that point—his own gun and D.B.'s gun. She told the district court that D.B. did not point or shoot his gun at Murray, and that he did not threaten Murray.

Following the shooting, Murray ran out of the apartment. P.G. testified that she locked the door behind Murray while D.B.—who was still conscious—called 911 to report the shooting. D.B. initially spoke with the 911 dispatcher, but P.G. took over the call when D.B. was unable to continue. Although the 911 dispatcher testified that P.G. said she was asleep during the shooting and did not know what happened, P.G. told the district court that she did not recall telling the dispatcher that she had been asleep.

Minneapolis police officers answered the emergency call at the apartment. According to the officers' testimony, P.G. reported that Murray shot D.B. They further testified that P.G. was "distraught," in "distress, hyperventilating, [and] having a hard time speaking." The state presented video from the officers' body-worn cameras to corroborate the officers' testimony regarding P.G.'s statements.

D.B. ultimately died as a result of his injuries. A medical examiner testified that D.B. had been shot twice and that his death was a homicide. A blood sample collected during the autopsy showed that D.B. had drugs in his system, including benzylamine, cocaine, morphine, fentanyl, and Trazodone.

Officers collected evidence from the apartment, including a white residue believed to be narcotics on the floor and three discharged cartridge casings. A forensic scientist

4

testified that examination of the three cartridge casings revealed that they had been fired from the same gun.

A homicide detective questioned P.G. later in the day following the shooting. The detective testified at trial that P.G. said she saw Murray shoot D.B. According to the detective, he asked P.G. multiple times to explain the sequence of the events in the apartment, and in his assessment, her description of the shooting was consistent. P.G. also viewed a photo lineup and identified Murray as the shooter.

The police arrested Murray for D.B.'s murder the following month. Murray initially told the detective that he did not "murder" anyone, but he admitted it was possible that he had robbed someone. The detective testified at trial that he interpreted Murray's statement "as a confession" that Murray had "participat[ed] in the event that led up to the death of [D.B.]."

During his trial testimony, Murray told the district court that he shot D.B. to defend himself. He testified that he went to D.B.'s apartment because he had arranged to sell heroin to D.B. Murray acknowledged that he was armed with a gun. He testified that he gave some heroin to D.B. and P.G. But, according to Murray, D.B. asked for more and was angered when Murray refused to supply him. Murray testified that he was preparing to leave the apartment when D.B. "aimed a firearm" at him and demanded Murray's bag of heroin. According to Murray, he threw a bag of heroin at D.B., and P.G. grabbed the bag when it fell to the floor. Murray testified that he "tried to run out of the room" but "saw a flash" when D.B. fired the gun at him. Then, according to Murray, he fired his own gun at D.B., almost simultaneously. Murray denied P.G.'s claims that he asked D.B. for a

5

gun and ultimately took D.B.'s gun. And, according to Murray, he did not realize that he shot D.B. or that D.B. had died until nearly a month later. When Murray's trial counsel asked why Murray did not report to the detective that he had shot D.B. in self-defense, Murray responded, "I didn't want to be linked to the situation and be linked to the other drug activities and carrying a gun." He further explained that he did not think the police would believe him.

The district court found Murray guilty of the three charged offenses—second-degree intentional murder, second-degree felony murder, and unlawful possession of a firearm—and entered convictions for each offense. It adjudicated Murray guilty of the charges but only pronounced sentences for second-degree intentional murder and unlawful possession of a firearm. The district court sentenced Murray to 425 months in prison for second-degree intentional murder and imposed a concurrent 60-month prison sentence for the firearm offense.

Murray appeals.

## DECISION

**I.     Murray is not entitled to a new trial based on the conduct of the trial judge.**

**A.     The trial judge's conduct did not violate Murray's constitutional right to an impartial judge.**

Murray argues that the trial judge violated his constitutional right to a fair and impartial judge by questioning trial witnesses and the attorneys. The United States and Minnesota Constitutions guarantee criminal defendants the right to be tried by an impartial jury. U.S. Const. amend. VI; Minn. Const. art. I, § 6. Although a corresponding right to

6

an impartial judge is not specifically enumerated in the United States or Minnesota Constitutions, this principle has long been recognized as a component of due process. *State v. Dorsey*, 701 N.W.2d 238, 252 (Minn. 2005) (prohibiting a judge from presiding over a trial if the judge shows "actual bias" against the defendant). But "[t]he mere fact that a party declares a judge partial does not in itself generate a reasonable question as to the judge's impartiality." *State v. Reek*, 942 N.W.2d 148, 156 (Minn. 2020) (quotation omitted). Indeed, an appellate court must presume that the district court has discharged its duties properly. *McKenzie v. State*, 583 N.W.2d 744, 747 (Minn. 1998).

The reviewing court considers de novo whether a trial judge's conduct violated a criminal defendant's constitutional right to be tried before an impartial judge. *Dorsey*, 701 N.W.2d at 249. A violation of this right is structural error, which requires a new trial without regard to prejudice. *Id.* at 253.

Murray contends that the trial judge who presided over his court trial was not a neutral arbiter but acted as an advocate, violating his right to an impartial judge. He argues that the trial judge violated his right to an impartial judge in two ways—first, by extensively questioning trial witnesses, and second, by questioning the prosecutor during closing argument and rebuttal closing argument.

Murray directs us to several instances of witness questioning. The trial judge asked a police officer with the crime-lab unit to clarify where a discharged casing was found, and the officer responded, using a sketch of the apartment to illustrate where the casing was found. Following up, the trial judge asked whether any bullet holes or fragments had been found in the bedroom, and the officer testified that there were no bullet holes or fragments.

7

During the detective's testimony, the trial judge asked whether the detective had "[a]ny theory" about why there were three discharged casings even though other evidence—including the medical examiner's testimony—suggested there were only two shots fired. The detective responded that he believed Murray fired three shots even though a third bullet had not been found. Based on this response, the trial judge then asked, "You didn't see any evidence that a bullet was fired from the direction of [D.B.] towards Mr. Murray?" The detective answered, "No."

As further evidence of alleged bias, Murray points to an exchange that the trial judge initiated with Murray following Murray's direct and cross-examinations.

> COURT: I just need some clarifications on what happened. You said that you were talking to [D.B.] while you were seated. And he was asking for more drugs, something to that effect.
> WITNESS: Yes, sir.
> COURT: Did you begin leaving the . . . bedroom after you saw a gun or before you saw a gun?
> WITNESS: After I saw a gun.
> COURT: And was he pointing it at you?
> WITNESS: Yes.
> COURT: Was he sitting on the bed at that time or standing?
> WITNESS: He was standing.
> COURT: Was he in the middle of the bed or closer to the wall?
> WITNESS: It's the wall, the mattress, and then another wall. He was standing right here at the tip of the mattress.
> COURT: So kind of by the nightstand that was there?
> WITNESS: Yes.
> COURT: And do you remember what kind of gun it was? Maybe you didn't get a good look at it.
> WITNESS: It was a black gun, sir.
> COURT: Revolver or automatic?
> WITNESS: Automatic.
> COURT: Or semiautomatic, I guess it would be?
> WITNESS: Yes.
> COURT: Do you remember if he fired first or if you fired first?

WITNESS: I'm going to say simultaneously, sir. As I was exiting, I just in my periphery saw a flash. I just was running for my life.

COURT: Are you confident that he shot his gun?

WITNESS: Yes.

COURT: And when you shot back, were you shooting across your body, or did you turn to face him?

WITNESS: Across.

COURT: And was that about when you were at the threshold of the bedroom going into the other bedroom and hallway for your first shot?

WITNESS: Yes.

COURT: And was the second shot immediately after that or shortly after that?

WITNESS: I am going to say rapidly, like boom, boom.

COURT: Kind of as quick as you can pull the trigger?

WITNESS: Yes.

COURT: And [D.B.] was standing as far as you know when all of this happened?

WITNESS: I didn't look back no more. But last time I seen him, he was standing.

COURT: Did you see if he fell forward, fell backward, or just didn't see him at all?

WITNESS: I was trying to get out that door, sir.

In addition to the trial judge's witness questioning, Murray complains that the trial judge assisted the state by questioning the prosecutor during closing argument and rebuttal closing argument. During the prosecutor's closing argument, the trial judge referenced P.G.'s initial comment to the 911 dispatcher that she was asleep during the shooting and stated that P.G.'s inconsistent statements "create[] a gap in credibility that [the state] need[s] to fill"; challenged the prosecutor's statement that Murray's reason for visiting the apartment was to seek a gun, pointing out that Murray already had a gun; and inquired about Murray's motive to fire the second and third shots after D.B. turned over his gun.

9

Although not discussed in Murray's brief, we note that the trial judge also questioned Murray's counsel during closing argument. The trial judge asked about the location of D.B.'s gun: "If I accept the fact that [D.B.] had a gun . . . where is it?" Defense counsel responded that Murray "doesn't know where that gun went."

Based on our careful review of the record, we are satisfied that the trial judge's questions to witnesses and the attorneys did not violate Murray's constitutional right to a trial before an impartial judge.

We first address the trial judge's questions to witnesses. Preliminarily, we note that, under the Minnesota Rules of Evidence, a trial judge is permitted to question witnesses. Rule 614(b) allows a district court judge to "interrogate witnesses, whether called by itself or by a party." Minn. R. Evid. 614(b); *see also* Minn. R. Evid. 614 1977 comm. cmt. (stating that the traditional right of trial courts to call and interrogate witnesses "is consistent with the responsibility of the Court in insuring a speedy and just determination of the issues"); *Olson v. Blue Cross & Blue Shield*, 269 N.W.2d 697, 702 (Minn. 1978) (finding that the district court properly exercised its authority in questioning a witness where counsel's questioning had "partially covered the same ground"); *Teachout v. Wilson*, 376 N.W.2d 460, 465 (Minn. App. 1985) (holding that, in a civil court trial, a trial judge's clarifying questions to a witness were "a proper exercise of the power granted by Rule 614"), *rev. denied* (Minn. Dec. 30, 1985). Given rule 614(b), there was nothing inherently improper about the trial judge's decision to question witnesses.

Although the rules of evidence allow a district court judge to interrogate witnesses, a criminal trial is not merely a "search for truth" but is designed to protect a defendant's

10

liberty by ensuring that the state proves its case. *State v. Costello*, 646 N.W.2d 204, 213 (Minn. 2002) (quotation omitted). Thus, in a criminal trial, a trial judge must not act in a manner that intrudes on the state's burden of proof. *See Dorsey*, 701 N.W.2d at 251. With this concern in mind, we next examine the specific questions that the trial judge posed to witnesses and the testimony that those questions elicited.

Murray argues that the trial judge's conduct here was "not meaningfully different" than the conduct at issue in *Dorsey*, which Murray cites to support his argument that the trial judge's conduct violated his constitutional right to an impartial trial judge. In *Dorsey*—also a criminal appeal following a court trial—the trial judge directed a court clerk to investigate an incriminating fact that the trial judge independently recalled, but which the prosecutor had not introduced in evidence. *Id.* at 243-44. The trial judge then announced the result of the investigation in open court. *Id.* The Minnesota Supreme Court reversed Dorsey's resulting conviction, concluding that the trial judge's conduct deprived Dorsey of his constitutional right to an impartial factfinder. *Id.* at 253.

Here, unlike in *Dorsey*, the trial judge questioned witnesses on both sides in open court. And here, the trial judge's questions merely confirmed evidence that had already been introduced or inferences from that evidence. Thus, in questioning the witnesses, the trial judge clarified witness testimony and did not investigate or produce new evidence for the prosecution. The trial judge did not abandon his role as an impartial factfinder; rather, the trial judge used questions to further understand the evidence presented. We therefore reject Murray's argument that *Dorsey* compels reversal of his convictions.

11

Additionally, we observe that the trial judge's questions to witnesses did not reflect bias in favor of either party. Instead, the questions show the trial judge's concern about fully understanding the evidence presented.

Likewise, the trial judge's questions to the attorneys during closing arguments reflect this same concern. The trial judge questioned the attorneys representing both parties. The questions themselves did not assist or favor one party over the other. Rather, the questions enabled both attorneys to address the trial judge's concerns about the implications of the trial evidence. Notably, the trial judge's questions evinced skepticism about the positions of both parties.

The record does not support Murray's argument that the trial judge engaged in conduct that helped the prosecution or otherwise demonstrated improper bias. We therefore conclude that Murray is not entitled to reversal of his convictions on this basis.

**B.    Murray fails to show that the trial judge had actual bias and was disqualified under the Code of Judicial Conduct.**

Separate from his constitutional argument, Murray contends that, by questioning witnesses and the attorneys during trial, the trial judge demonstrated a lack of impartiality that violated the Code of Judicial Conduct. "A judge must not preside at a trial or other proceeding if disqualified under the Code of Judicial Conduct." Minn. R. Crim. P. 26.03, subd. 14(3). Additionally, "[a] judge shall disqualify himself . . . in any proceeding in which the judge's impartiality might reasonably be questioned." Minn. Code Jud. Conduct Rule 2.11(A). "Impartiality" is defined as the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in

12

considering issues that may come before a judge." *State v. Pratt*, 813 N.W.2d 868, 876 (Minn. 2012) (quotation omitted). "The prohibition against a judge presiding when his or her impartiality might reasonably be questioned leaves considerable room for interpretation and does not provide a precise formula that can automatically be applied." *Id.* (quotation omitted).

When, as here, an appellant alleging judicial bias did not move to disqualify the judge during the proceedings below, the reviewing court will reverse only if the judge's failure to recuse was plain error that affected the appellant's substantial rights. *State v. Schlienz*, 774 N.W.2d 361, 365-66 (Minn. 2009) (applying plain-error standard of review where appellant raised judicial bias for the first time on appeal). To obtain reversal based on plain error, the appellant must first establish that an error occurred, that the error was plain, and that the error affected the appellant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). If the appellant satisfies these elements, the reviewing court must consider whether reversal is necessary to ensure the fairness and integrity of the judicial proceedings. *Id.*

In cases of alleged judicial bias, an appellant claiming plain error must show that the judge harbored actual bias. *State v. Plantin*, 682 N.W.2d 653, 663 (Minn. App. 2004) ("After a defendant submits to trial before a judge without objecting to the judge on the basis of bias, we will reverse the defendant's conviction only if the defendant can show actual bias in the proceedings."), *rev. denied* (Minn. Sept. 29, 2004).

Murray argues that the trial judge showed actual bias by questioning the witnesses and attorneys during trial. A party's "subjective belief that the judge is biased does not

13

necessarily warrant removal." *Hooper v. State*, 680 N.W.2d 89, 93 (Minn. 2004). And, based on our review of the record, we discern no actual bias. As discussed, the record shows that the trial judge, sitting as the finder of fact, asked questions designed to clarify the evidence and to comprehend the significance of that evidence. We do not interpret the trial judge's questions as demonstrating actual bias. And Murray fails to identify any other conduct suggesting that the trial judge had actual bias. *See State v. Burrell*, 743 N.W.2d 596, 603 (Minn. 2008) (placing burden on the complaining party to "adduce evidence of favoritism or antagonism").[1] Thus, we reject his argument that the trial judge was disqualified to preside at trial under the Code of Judicial Conduct.

## II. Murray is not entitled to a new trial based on allegedly erroneous factual findings.

Murray argues that he is entitled to a new trial because his convictions are based on erroneous factual findings. "A factual finding is clearly erroneous when it lacks evidentiary support in the record." *State v. Lopez*, 988 N.W.2d 107, 116 (Minn. 2023) (citing *State v. Roberts*, 876 N.W.2d 863, 868 (Minn. 2016)).

Murray challenges two factual findings as clearly erroneous. First, he contends that there is no record support for the district court's finding that he shot D.B. with a gun that ejected cartridges "to the right of the person firing the weapon." The district court found

---

[1] Noting that jurors in Minnesota may not question witnesses in criminal trials, *see Costello*, 646 N.W.2d at 211-14, Murray also urges us to extend this principle to judges presiding over criminal court trials. As an error-correcting court, we decline to do so. *See State v. McCormick*, 835 N.W.2d 498, 510 (Minn. App. 2013) (describing the court of appeals as "an error-correcting court," which is limited to finding the law and applying it to the facts (quotation omitted)), *rev. denied* (Minn. Oct. 15, 2013).

that, because Murray used a semiautomatic pistol, the discharged casings ejected to his right. Based on this finding, the district court further found that "the final locations of those [casings] are consistent with Mr. Murray firing three times, including once on his way out the door." Murray points out that the finding regarding the direction of casings discharged by a semiautomatic pistol is contrary to trial testimony that casings can be ejected to either the right or the left of a such a weapon. Second, Murray argues that the record directly contradicts the trial judge's finding that police officers did not find drugs in the apartment. He notes that an officer testified at trial that police found "some suspected drugs underneath the bed," namely "[w]hat appeared to be a white, powdery substance."

"A clearly erroneous finding . . . does not require a new trial when independent findings of fact, decisive of the case, are supported by the record." *Lopez*, 988 N.W.2d at 116. Even if we assume that Murray's challenged factual findings are clearly erroneous, these facts are inconsequential to the guilty verdicts, which are supported by other independent factual findings decisive of the case. The district court found that Murray pointed his gun at D.B. and shot him, and these facts are supported by the record. Indeed, Murray's own testimony established these facts—he admitted that he went to D.B.'s apartment with a gun and shot D.B. Although Murray claimed that he acted in self-defense, the district court determined that Murray's statements were not credible given the other testimony and evidence presented, including the lack of any evidence suggesting that D.B. fired a gun in Murray's direction. As a reviewing court, we must defer to the district court's credibility determinations. *State v. King*, 990 N.W.2d 406, 421 (Minn. 2023). Because the

district court's independent factual findings amply support the guilty verdicts, Murray is not entitled to reversal of his convictions.

### III. Because second-degree felony murder is an included offense of second-degree intentional murder, Murray's felony-murder conviction must be vacated.

Murray argues that the district court erred by entering judgments of conviction on both murder charges. "Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both." Minn. Stat. § 609.04, subd. 1 (2020). "An included offense may be . . . a lesser degree of the same crime." *Id.*, subd. 1(1); *see also State v. Hannon*, 703 N.W.2d 498, 509 (Minn. 2005) ("In Minnesota, every lesser degree of murder is intended by § 609.04 to be characterized as an included offense."). Whether one offense is an included offense of another is a legal question that an appellate court reviews de novo. *State v. Cox*, 820 N.W.2d 540, 552 (Minn. 2012). The state concedes that the district court erred by entering convictions on both second-degree murder offenses. We agree.

The district court found Murray guilty of both second-degree intentional murder and second-degree felony murder. At sentencing, the district court entered convictions for both second-degree murder offenses, but sentenced Murray for only second-degree intentional murder. The warrant of commitment reflects that Murray was convicted of both crimes.

"Whether an offense is a 'lesser-included offense' is determined by examining the elements of the offense rather than the facts of a particular case." *State v. Lory*, 559 N.W.2d 425, 428 (Minn. App. 1997) (citing *State v. Roden*, 384 N.W.2d 456, 457 (Minn. 1986)), *rev. denied* (Minn. Apr. 15, 1997). After examining the elements of second-degree

16

intentional murder and second-degree felony murder in *Lory*, we determined that second-degree felony murder is a lesser-included offense of second-degree intentional murder. *Id.* at 426, 428-29. Based on this precedent, we conclude that the district court erred by convicting Murray of both second-degree murder offenses. When a district court erroneously enters a conviction for an included offense, the appellate court remands to the district court to vacate the conviction for the included offense. *State v. Balandin*, 944 N.W.2d 204, 222 (Minn. 2020). We therefore reverse in part and remand to the district court with instructions to vacate count two, the felony-murder conviction, and to amend the warrant of commitment. *See State v. Earl*, 702 N.W.2d 711, 723-24 (Minn. 2005) (recognizing that a finding of guilt remains even when a conviction is vacated by operation of section 609.04).

**IV. Murray is not entitled to relief based on the arguments raised in his pro se supplemental brief.**

Murray filed a pro se supplemental brief arguing that the district court misapplied the law on self-defense. He further contends that he received ineffective assistance of counsel. For the reasons discussed below, we determine that Murray is not entitled to relief on these arguments.

**A. Jury Instructions**

Murray argues that the district court relied on the wrong jury instruction in evaluating his self-defense claim. He contends that the district court applied the justifiable-taking-of-life jury instruction, rather than the general self-defense instruction.

17

The general law of self-defense permits the use of reasonable force against another "when used by any person in resisting or aiding another to resist an offense against the person." Minn. Stat. § 609.06, subd. 1(3) (2020). The justifiable taking of life may be authorized "when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor . . . to great bodily harm or death, or preventing the commission of a felony in the actor's place of abode." Minn. Stat. § 609.065 (2020). "The Minnesota Supreme Court has repeatedly stated that it is error to provide the justifiable-taking-of-life instruction, instead of the general self-defense instruction, when the defendant asserts self-defense but claims that the [victim's] death was not the intended result." *State v. Pollard*, 900 N.W.2d 175, 179 (Minn. App. 2017).

Murray asserts that he did not intend to take D.B.'s life. Accordingly, he contends, the district court erred by relying on the justifiable-taking-of-life instruction instead of the general self-defense instruction. But Murray had a court trial, rather than a jury trial. The district court did not give a jury instruction. And a review of the district court's order does not show an improper interpretation or application of the law. It is true that "[w]hen a district court misapplies well-established law in a bench trial, it is as if the district court instructed itself incorrectly on the law." *State v. Spann*, 986 N.W.2d 205, 216 (Minn. 2023). However, we discern no error of law here.

Following a court trial, a district court is required to make written findings of the essential facts. Minn. R. Crim. P. 26.01, subd. 2(b). The purpose of the written-findings requirement is "to aid the appellate court in its review of [a] conviction resulting from a nonjury trial." *State v. Scarver*, 458 N.W.2d 167, 168 (Minn. App. 1990). In this case, the

18

district court issued a detailed memorandum setting out its factual findings and legal conclusions. A review of the district court's order reveals that the district court applied the proper law to Murray's case. The district court relied on *State v. Basting*, which articulates the four elements of a self-defense claim. 572 N.W.2d 281, 285-86 (Minn. 1997). As the district court noted, Murray had the burden of producing evidence to support his self-defense claim. *State v. Johnson*, 719 N.W.2d 619, 629 (Minn. 2006). In weighing the evidence in the record and applying the *Basting* factors to its factual findings, the district court concluded that Murray's self-defense claim failed because he did not meet his burden of establishing the elements of this defense. Because the district court relied on the correct law, and its application of that law was proper, we conclude that no error occurred.

## B.     Ineffective Assistance of Trial Counsel

Murray argues that he received ineffective assistance of trial counsel. A defendant has a constitutional right to the effective assistance of counsel in all criminal prosecutions. U.S. Const. amend. VI; Minn. Const. art I, § 6; *Taylor v. State*, 887 N.W.2d 821, 823 (Minn. 2016). A reviewing court examines ineffective-assistance-of-counsel claims under the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *State v. Ellis-Strong*, 899 N.W.2d 531, 535 (Minn. App. 2017). Under *Strickland*, a defendant "must demonstrate that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that the outcome would have been different but for counsel's errors." *Andersen v. State*, 830 N.W.2d 1, 10 (Minn. 2013). "Application of the *Strickland* test involves a mixed question of law and fact, which we review de novo." *State v. Mouelle*, 922 N.W.2d 706, 715 (Minn. 2019).

19

Murray argues that his trial counsel provided ineffective assistance by failing to: (1) perform an independent investigation, (2) properly impeach P.G.'s testimony, (3) hire expert witnesses, (4) call a police officer to testify regarding Murray's gun charge, (5) assert a speedy-trial violation, (6) challenge the legality of his arrest, (7) challenge the "malice aforethought" element of the crime, (8) present evidence of mitigating circumstances at sentencing, (9) object to the trial judge's conduct at trial, (10) request a different probation officer, (11) share with him the evidence produced during discovery, and (12) challenge the guilty verdict or assist him with his appeal.

The majority of Murray's claims do not satisfy the first *Strickland* element because they are matters of trial strategy. Trial counsel's decisions regarding what evidence to present and what witnesses to call are matters of trial strategy. *State v. Vick*, 632 N.W.2d 676, 689 (Minn. 2001). Similarly, an attorney's decisions concerning trial defenses typically are a matter of strategy. *Voorhees v. State*, 627 N.W.2d 642, 651 (Minn. 2001) ("[M]atters of trial strategy, including which defenses to raise at trial, will not be reviewed later for competence."). Generally, we do not "review ineffective assistance of counsel claims based on trial strategy." *Sanchez-Diaz v. State*, 758 N.W.2d 843, 848 (Minn. 2008). To the extent that Murray's ineffective-assistance arguments rely on matters of trial strategy, we do not address them.

As to Murray's claims of ineffective assistance of counsel that do not involve matters of trial strategy, we decline to address them because the factual record is insufficiently developed for appellate review. *See Dukes v. State*, 621 N.W.2d 246, 254-55 (Minn. 2001) (stating that ineffective-assistance-of-counsel claims that require

additional factfinding—such as "claims that require a court to explore conversations between attorney and client"—should be raised in a petition for postconviction relief).

**Affirmed in part, reversed in part, and remanded.**